## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GERALD GEORGE, CATHY DUNN, TIMOTHY STREFF, and ANDREW SWANSON, individually and as representatives of a class of similarly situated persons, | ) ) ) ) ) ) | Case No. 1:07-cv-01713<br><br>Magistrate Judge Sidney I. Schenkier |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| KRAFT FOODS GLOBAL, INC., KRAFT FOODS GLOBAL, INC. ADMINISTRATIVE COMMITTEE, BENEFITS INVESTMENT COMMITTEE, and JIM DOLLIVE, KAREN MAY, MARC FIRESTONE, and PAMELA KING, all in their capacities as members of the Benefits Investment Committee, | ) ) ) ) ) ) ) ) | **REDACTED PORTIONS OF DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE ARE NO GENUINE ISSUE FILED UNDER SEAL** |
| Defendants. | ) ) ) | |

**Restricted Document Pursuant to LR26.2**

This is a restricted document pursuant to LR26.2 of the United States District Court, Northern District of Illinois.  Protective Order entered September 4, 2008

**DATED:  May 22, 2009**

Respectfully submitted,

*/s/Ronald J. Kramer*
One of Their Attorneys

Ronald J. Kramer (rkramer@seyfarth.com)
Ian H. Morrison (imorrison@seyfarth.com)
Amanda A. Sonneborn (asonneborn@seyfarth.com)
Sam Schwartz-Fenwick (sschwartz@seyfarth.com)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, IL 60603
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GERALD GEORGE, CATHY DUNN, TIMOTHY STREFF, and ANDREW SWANSON, individually and as representatives of a class of similarly situated persons,        ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **Plaintiffs,**   ) <br> ) <br> ) <br> v.         ) <br> ) <br> KRAFT FOODS GLOBAL, INC., KRAFT FOODS GLOBAL, INC. ADMINISTRATIVE COMMITTEE, BENEFITS INVESTMENT COMMITTEE, and JIM DOLLIVE, KAREN MAY, MARC FIRESTONE, and PAMELA KING, all in their capacities as members of the Benefits Investment Committee,  ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **Defendants.**  ) <br> ) | Case No. 1:07-cv-01713 <br><br> Magistrate Judge Sidney I. Schenkier |

**DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO
WHICH THERE IS NO GENUINE ISSUE**

Defendants, Kraft Foods Global, Inc., Kraft Foods Global, Inc. Administrative Committee, Benefits Investment Committee, Jim Dollive, Karen May, Marc Firestone, and Pamela King, by their attorneys and pursuant to Local Rule 56.1, submit the following statement of material facts as to which there is no genuine issue.[1]

**I.      Jurisdiction and Venue**

1.      This Court has jurisdiction over the subject matter of plaintiffs' claims and venue is proper in this district.  (Ans. ¶ 21; Docket No. 46.)

---

[1] All documents referenced herein are found in the attached Appendix to Defendants' Motion for Summary Judgment and separated by tab.  Citations to these documents reference the tab number (*e.g.*, App. Tab ___.)

## II.     Parties and Plan Administration

2.      Plaintiffs Gerald George, Cathy Dunn, Timothy Streff, and Andrew Swanson are current or former participants in the Kraft Foods Global, Inc. Thrift Plan (the "Plan").  (Ans. ¶¶ 12-16.)

3.      Defendant Kraft Foods Global, Inc. ("Kraft") sponsors the Plan -- a tax qualified "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), which also contains an employee stock ownership plan.  (Ans. ¶¶ 17, 27; App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan § 1.1 (KRAFTG0001920) and Third Amendment to the 2003 Plan (KRAFTG0007333)).)  It is a plan of the type popularly known as a "401(k) plan."  (Ans. ¶ 27.)

4.      Between 2000 and 2006, the Plan had between approximately 37,000 and 55,000 participants and $2.7 and $5.4 billion in assets.  (App. Tab 21, Youman Decl. ¶ 5.)

5.      The duty and authority to administer the Plan has been divided between several committees or entities, with the principal division being that one entity is responsible for investment and trust operations of the Plan (referred to in the Plan documents as the "Investment Committee") and another entity is responsible for non-investment operations of the Plan (referred to in the Plan documents as simply the "Committee").  (App. Tab 19, Youman Dep. (1/24/2007) 16; App. Tab 33, Def. Supp. Ans. Int. No. 16.; App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan § 1.3 (KRAFTG0001920)).)

6.      Until July 1, 2008, the Plan designated the Kraft Foods Global, Inc. Management Committee of Employee Benefits ("MCEB") as the Committee and the Plan Administrator. (App. Tab. 33, Def. Supp. Ans. Int. No. 16; App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan § 13 (KRAFTG0001955)).)  MCEB had the responsibility and authority to control and manage the non-investment operations of the Plan.  (App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan

§ 1.3 (KRAFTG0001920)); App. Tab 20, Youman Dep. (7/30/2008) 25.)  MCEB is not a

defendant in this action.  (*See generally* the Compl.)

      7.     Until July 1, 2008, MCEB in turn had delegated its authority to control the day-to-

day operation and administration of the Plan to defendant Kraft Foods Global, Inc.

Administrative Committee ("KFAC"), whose members were appointed by MCEB.  (App. Tab

33, Def. Supp. Ans. Int. No. 16.)

      8.     KFAC has at all relevant times delegated its responsibilities for the day-to-day

administration of the Plan to the Kraft Foods Benefits Department ("Kraft Benefits"), in which

approximately eight employees led by Jill Youman perform duties related to the Plan.  (App. Tab

20, Youman Dep. (7/30/08) 47-52; App. Tab 33, Def. Supp. Ans. Int. No. 16.)

      9.     Effective July 1, 2008, the Plan was amended to allocate responsibility directly to

KFAC which had previously been delegated to KFAC by MCEB.  (App. Tab 33, Def. Supp.

Ans. Int. No. 16; App. Tab 20, Youman Dep. (7/30/2008) 47-48.)

      10.    Since its creation on January 27, 2004, defendant Benefits Investment Committee

("BIC") of Kraft Foods Global, Inc. has been the "Investment Committee," the entity designated

in the governing Plan document as having responsibility for the trust and investment operations

of the Plan, including specifically:

> the authority and responsibility to appoint or select trustees, custodians, investment
> managers and insurance companies to handle Plan assets and to allocate assets to each of
> them, to determine the advisability of establishing or modifying the description of any
> Investment Fund (as described in subsection 6.1) made available under the Plan, to
> establish investment guidelines, proxy voting policies and securities trading procedures,
> and to monitor the investment performance of the fiduciaries responsible for the
> investment of Plan assets.

(App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan Document at § 1.3 (KRAFTG0001920-21)

and First Amendment to the 2003 Plan (KRAFTG0458919)); *see also* App. Tab 33, Def. Supp.

Ans. Int. No. 16.)  Before January 27, 2004, the Plan gave this responsibility to other entities,

which are not defendants in this action. (App. Tab 33, Def. Supp. Ans. Int. No. 16; App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan Document § 1.3 (KRAFTG0001920-21)).)

11.    Defendants Jim Dollive, Karen May, Marc Firestone, and Pamela King, who are sued only in their capacity as members of the BIC (Compl. Caption), are or were members of the BIC. (Ans. ¶ 20.) Their dates of service on the BIC are as follows: Jim Dollive, from January 27, 2004 to October 31, 2007; Karen May, from January 2006 to June 25, 2008; Marc Firestone, from January 27, 2004 to June 25, 2008; and Pamela King, from July 2006 to the present. (App. Tab 3, Dollive Dep. 33-34; App. Tab 12, May Dep. 20-21; App. Tab 6, Firestone Dep. 20; App. Tab 10, King Dep. 23-24; App. Tab 33, Def. Supp. Ans. Int. No. 16.)

12.    The Plan gives the "Committee" (until July 1, 2008, this was MCEB) the "discretionary authority" to carry out a number of functions, including: 1) adopting such rules of procedure and regulations as, in its opinion, may be necessary for the proper and efficient administration of the Plan and as are consistent with the provisions of the Plan; 2) to enforce the Plan in accordance with its terms and with such applicable rules and regulations as may be adopted by the Committee; 3) to perform the functions of a "plan administrator," 4) to employ agents, attorneys, accountants or other persons for such purposes as the Committee considers necessary or desirable to discharge its duties. (App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan § 13.1 (KRAFTG0001955-56)).) '

13.    The Plan specifically provides: "Any interpretation of the Plan and any decision on any matter within the discretion of the Committee made by the Committee shall be final and binding on all persons." (App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan § 13.5 (KRAFTG0001957)).)

14.     The assets of the Plan are held under the Kraft Foods Master Defined Contribution Trust ("Master Trust") established pursuant to the Master Savings Plan Trust Agreement.  (Ans. ¶ 29; App. Tab 22, Dolsen Decl. ¶ 7, Ex. B).)

15.     Effective August 1, 2003, Deutsche Bank Trust Company Americas (which had been the Trustee of the Master Trust) sold its retirement plan trust business to State Street Bank and Trust Company ("State Street") and State Street assumed the role of Trustee of the Master Trust under the then-existing trust and compensation agreements.  (App. Tab 23, Werner Decl. ¶ 9; App. Tab 22, Dolsen Decl. ¶ 8, Ex. C.)

### III.     Plan Participants' Investment of Their Accounts.

16.     Plan participants control the investment of their own Plan accounts and may elect to invest a portion of their before and after-tax earnings (along with the matching contributions paid by Kraft) in any combination of investment options available under the Plan.  (App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan §§ 4, 5, 6 (KRAFTG0001927-1932)); App. Tab 15, Streff Dep. 60; App. Tab 7, George Dep. 41.)

17.     As of October 16, 2006, when this action was filed, and since at least October 2000, the Plan offered the following investment options for participants to chose from:

| Fund Name | Investment Objective Disclosed in the Summary Plan Description and Fund Fact Sheet | Range of Expenses Disclosed On Fund Fact Sheets (as a percentage of assets) |
|---|---|---|
| Altria Stock Fund (previously named Philip Morris Stock Fund) | To allow participants to invest in the Altria Group Inc. Stock (previously Philip Morris Cos. Stock) plus cash or short-term investments | 0.08% to 0.12% |
| Government Obligations Fund | To provide government bond investments, primarily U.S. Government obligations | 0.17% to 0.18% |

| Fund Name | Investment Objective Disclosed in the Summary Plan Description and Fund Fact Sheet | Range of Expenses Disclosed On Fund Fact Sheets (as a percentage of assets) |
|---|---|---|
| Interest Income Fund | To track the performance of the Lehman Brothers Mortgage-Backed Securities Index | 0.12% to 0.19% |
| U.S. Large Cap Equity Index Fund (before 7/1/2005, called the Equity Index Fund) | To track the S&P 500 Index | 0.08% to 0.11% |
| Balanced Fund | To provide a combination of current income and capital growth; invested in the DWS Lifecycle Long Range Fund managed by Deutsche Asset Management and its predecessor mutual funds. | 0.46% to 0.67% |
| International Equity Fund | To track the MSCI EAFE index w/Japan GDP Weighted | 0.13% to 0.32% |
| Euro Equity Fund | To track the MSCI EMU index | 0.13% to 0.32% |
| Kraft Stock Fund (added 11/1/2001) | To allow participants to invest in the Kraft Foods Inc. Stock, plus cash or short-term investments. | 0.08% to 0.22% |
| Mid-Small Cap Equity Fund (added 6/30/05) | To track the Russell Small Cap Completeness Index (i.e., the Russell 3000 index minus the stocks that make up the S&P 500) | 0.10% to 0.12% |
| Growth Equity Fund (removed 6/30/2005) | To allow participants to invest in the Investment in American Century's Heritage mutual fund | 0.82% to 1.07% |

(App. Tab 21, Youman Decl.¶ 10, Ex. D, F (KRAFTG0740728-30), G (KRAFTG0488757-58), H (KRAFTG0488704-707), I (KRAFTG0488554-558), J (KRAFTG0488386-390), K (KRAFTG0488275-79); App. Tab 17, Werner Dep. (9/10/2008) 86-88.)

**IV.    The Fees And Expenses Charged For Each Investment Option Were Regularly Disclosed To Plan Participants**

18.     The Plan describes the investment options to participants in several publications, including Summary Plan Descriptions ("SPDs"), quarterly statement inserts (known as "statement stuffers"), and quarterly fund fact sheets. (App. Tab 21, Youman Decl. ¶¶ 10-13.)

19.     Through these publications, the Plan has consistently disclosed to participants that the expenses incurred in administering the Plan (*i.e.*, recordkeeping, trustee services, audit, participant financial advice, participant communications and education and legal expenses of the Plan) and in investing the Plan's assets are deducted from their accounts. (App. Tab 21, Youman Decl. ¶¶ 10, 15, 16, Exs. D, E, F (KRAFTG0740752), G (KRAFTG0488779), H (KRAFTG0488722), I (KRAFTG0488577), J (KRAFTG0488409), K (KRAFTG0488296).)

20.     Through these publications, the Plan has also disclosed (1) the total fee as a percentage of assets for each investment option (i.e., the administrative fees combined with the investment fee), (2) any transaction fees unique to that option (such as redemption or exchange fees), (3) that participants may wish to consider fees in making their investment choices, and (4) the unitized nature of the Altria and Kraft Foods Global, Inc. Stock Funds. ((App. Tab 21, Youman Decl. ¶¶ 10, 12, 15, Exs. D, E, F (KRAFTG0740728), G (KRAFTG0488757), H (KRAFTG0488704-705), I (KRAFTG0488554-555), J (KRAFTG0488386-387), K (KRAFTG0488275, KRAFTG04882778-779).)

21.     In addition, important information regarding the Plan, including certain information regarding fees, is often included in the "statement stuffers." (App. Tab 21, Youman Decl. ¶ 12.) For example, in March 1998, 1999 and 2000, the Plan advised that fees were charged to the Plan, and listed all fund fees in comparison to the fees charged by mutual funds with similar investment objectives (App. Tab 21, Youman Decl. ¶¶ 12, 17, Ex. E (PLA 1867-68;

PLA 1842-43; KRAFTG0473233-34); in January 2005, the Plan compared the fees for each

investment option to fees charged by major mutual fund providers, and stated that fees range

from 8 cents per $100 investment to 82 cents per $100 investment, depending on the fund (App.

Tab 21, Youman Decl. ¶¶ 12, 17, Ex. E (KRAFTG0032268-71)); and since July 2002, all

quarterly statements have expressly reminded participants that fees are charged to the Plan and

that fee information is available on fund fact sheets. (App. Tab 21, Youman Decl. ¶¶ 12, 16, Ex.

E.)

  22.  SPDs have been furnished to participants by various means, including mass

mailings to all existing participants in 1995 and 2001 (App. Tab 21, Youman Decl. ¶ 14),

mailing of a computer disk to all participants in 2003, and by issuing copies to all employees

who are newly eligible to participate in the Plan. (App. Tab 21, Youman Decl. ¶14.)

  23.  The SPD, fund fact sheets, and other information regarding Plan fees are also

available to Plan participants on an internet site maintained by the Plan's recordkeeper, Hewitt

Associates ("Hewitt"). (App. Tab 21, Youman Decl. ¶¶ 11, 14, 26.) Plaintiffs all had access to

access this site and each of them did access this site from time to time. (App. Tab 15, Streff Dep.

32-33, 56-57, 62-63, 75-80; App. Tab 16, Swanson Dep. 21-22, 35-36; 57-61; App. Tab 2, Baldi

Dep. 79-81; App. Tab 7, George Dep. 63-67; App. Tab 5, Dunn Dep. 24-25, 41, 60-66, 82-85.)

  24.  Like the SPDs, the Plan issues fund fact sheets to all new participants, fact sheets

are available on the Plan internet site, and additional copies are available upon request. (App.

Tab 21, Youman Decl. ¶¶ 11, 14.)

  25.  In addition to all of the disclosures described above, the Plan is required to and

does file annually an IRS Form 5500, which discloses the amount of compensation paid to each

Plan service provider, and a summary annual report. (App. Tab 21, Youman Decl. ¶ 19, Exs. L and M.)

26.    Summary annual reports are distributed to participants each year, and the Form 5500s and additional copies of the summary annual reports are available upon request to participants. (App. Tab 21, Youman Decl. ¶ 19, Exs. L and M.)

27.    Since 2002, the Plan has offered participants the opportunity to use the services of an independent online financial advisor – Financial Engines – to assist them with making investment choices. (App. Tab 21, Youman Decl. ¶ 20; App. Tab 14, Pechnyo Dep. 41-42; App. Tab 5, Dunn Dep. 65; App. Tab 15, Streff Dep. 64-65.)

28.    The SPD states that the Plan is intended to qualify under ERISA Section 404(c), and that as a result, fiduciaries are not liable for losses that are the direct and necessary result of the participant's investment instructions. (App. Tab 21, Youman Decl. ¶ 15, Exs. F (KRAFTG0740757), G (KRAFTG0488785), H (KRAFTG0488729), I (KRAFTG0588583), J (KRAFTG0488415), K (KRAFTG0488302).)

**V.    Fiduciary Oversight And Management Of The Plan**

29.    BIC generally meets quarterly to review, among other matters, the performance, net of fees, of each of the Plan's investment options and to compare that performance to a benchmark index (that is not adjusted to reflect any fee). (App. Tab 10, King Dep. 42, 52-53; App. Tab 12, May Dep. 25-26, 39, 158; App. Tab 23, Werner Decl. ¶¶ 20-21; App. Tab 22, Dolsen Decl. ¶¶ 23-24.)

30.    Before each BIC meeting, detailed materials are distributed to the BIC members and after each meeting, minutes of the meetings are prepared for approval at the next meeting. (App. Tab 22, Dolsen Decl. ¶ 23; App. Tab 23, Werner Decl. ¶ 20; App. Tab 17, Werner Dep. (9/10/2008) 45-46; App. Tab 12, May Dep. 158-59.)

31.    Since its inception on January 27, 2004, BIC has delegated certain of its responsibilities, including the provision of administrative oversight of the Trust and the tracking of investment and other expenses of the Plan, to teams of responsible employees at Kraft or at a subsidiary of Kraft's former parent company, Altria Group Inc. ("Altria") (formerly known as Philip Morris Companies Inc. ("Philip Morris")).  (App. Tab 33, Def. Supp. Ans. Int. No. 16.)

32.    Specifically until March 30, 2007, when Kraft was spun off completely from Altria, BIC delegated this responsibility to the Benefit Investments Group of Altria Corporate Services, Inc. ("ALCS Benefit Investments"), which was managed by Mark Werner and consisted of approximately four employees.  (App. Tab 33, Def. Supp. Ans. Int. No. 16; App. Tab 23, Werner Decl. ¶¶ 3-4, 6-8, Ex. A.)  This responsibility also was delegated to ALCS Benefit Investments by BIC's predecessors.  (App. Tab 23, Werner Decl. ¶¶ 6-7; App. Tab 33, Def. Supp. Ans. Int. No. 16.)

33.    After Kraft was spun off from Altria on March 30, 2007, BIC delegated this responsibility to the newly created Benefit Investments Group of Kraft ("Kraft Benefit Investments"), which was managed by Michael Dolsen and consisted of three employees.  (App. Tab 33, Def. Supp. Ans. Int. No. 16; App. Tab 22, Dolsen Decl. ¶¶ 2-3, 5, Ex. A; App. Tab 4, Dolsen Dep. 10, 14-15.)

34.    The ALCS Benefit Investments and Kraft Benefit Investments have had the responsibility: (1) to oversee the relationship with the pension and 401(k) plans' trustees; (2) to have oversight responsibility for the individual investment managers that manage portfolios in both the pension plan and the 401(k) plan; (3) to have meetings with the investment managers on a periodic basis to track their performance and get their latest views on the portfolio and ask them questions; (4) to do due diligence on the individual managers on a periodic basis to ensure

that the investment managers perform the duties expected of them; and (5) to report on investment performance to BIC. (App. Tab 4, Dolsen Dep. 20-21.)

35.    On December 8, 2004, July 6, 2006, and July 3, 2007, BIC conducted specific reviews of the Plan's fees, considering (at different times) information reflecting that the Plan's fees compared favorably to investments available in the Fidelity and Vanguard mutual fund families and to the fees reported by similarly sized plans participating in Committee on Investment of Employee Benefit Assets ("CIEBA") surveys of defined contribution plans. (App. Tab 23, Werner Decl. ¶¶ 23-24, Exs. E, F, G, H; App. Tab 22, Dolsen Decl. ¶ 26, Exs. G, H).)

36.    The data BIC reviewed regarding the Plan's fees and expenses is consistent with the unrebutted report and testimony of defendants' expert Chris Flynn, which shows that the fees and expenses paid to manage the Plan are close to or below the median expense level reported by similarly sized defined contribution plans. (App. Tab 27(A), Flynn Rep. 4; App. Tab 27, Flynn Dep. 31, 112, 139.)

37.    Kraft and Altria often receive and are privy to surveys conducted regarding plan fees, which have been used to evaluate whether the Plan's fees are at an appropriate level. (App. Tab 21, Youman Decl. ¶ 50; App. Tab 23, Werner Decl. ¶ 16; App. Tab 22, Dolsen Decl. ¶ 20.)

38.    For example, in February 1998, Mark Werner reviewed a survey of 132 companies conducted by the Financial Executives Institute, which analyzed the administrative costs of the plans similar to the Kraft Thrift Plan. (App. Tab 23, Werner Decl. ¶ 17, Ex. C.) He determined that the Plan's total administrative fees (7 basis points or .07%) compared favorably to the median administrative cost of 11 basis points for similarly sized plans. (App. Tab 23, Werner Decl. ¶ 17, Ex. C (ALT0015070).)

39.    Kraft and Altria also periodically participated in fee surveys conducted by CIEBA which showed that the Plan's recordkeeping and other fees compared favorably to those of other similarly sized plans.  (App. Tab 21, Youman Decl. ¶ 51; App. Tab 23, Werner Decl. ¶ 18, Ex. D; App. Tab 22, Dolsen Decl. ¶ 21; App. Tab 4, Dolsen Dep. 43-44, 119-120.)

40.    Staff in Kraft Benefits and the ALCS and Kraft Benefit Investments Groups also review periodicals and would routinely attend conferences with their counterparts at other companies, which allows them informally to gather information regarding the fees other plans pay for services.  (App. Tab 21, Youman Decl. ¶ 52; App. Tab 22, Dolsen Decl. ¶ 19; App. Tab 23, Werner Decl. ¶ 15.)  For example, based on such interactions, Youman understood that the Plan's recordkeeping fees were very competitive with those paid by other similarly sized plans. (App. Tab 21, Youman Decl. ¶ 53.)

## VI.    The Unitized Nature Of The Kraft And Altria Stock Funds Is Typical Of Similar Plans, And There Is No Evidence Of Excessive Fees Or Cash Held In The Funds.

### A.    The Kraft And Altria Stock Funds.

41.    Since at least 1995, the Plan has offered the Altria Stock Fund as an investment option and in late 2001, in connection with the initial public offering of Kraft Foods Inc. stock, the Plan added a Kraft Foods Inc. Stock Fund.  (App. Tab 17, Werner Dep. (9/10/2008) 86-87.) (Collectively these funds are referred to as the "Company Stock Funds" or "CSFs.")

42.    The Company Stock Funds are "unitized funds;" that is they hold both common stock (Kraft Foods Inc. or Altria, respectively), and a small amount of cash or short-term investments for administrative purposes (the "cash buffer").  (App. Tab 22, Dolsen Decl. ¶ 18.) Participants who elect to invest in the CSFs hold units in those funds, which represent a share of the overall value of the fund.  (App. Tab 22, Dolsen Decl. ¶ 18; App. Tab 4, Dolsen Dep. 172-173.)

43.    The governing Plan documents as well as the Trust agreement explicitly permit the CSFs to maintain a cash buffer. (App. Tab 21, Youman Decl. ¶ 5, Ex. C (2003 Plan § 6.1 (KRAFTG001930-31)), App. Tab 22, Dolsen Decl. ¶ 7, Ex. B (Trust § 9(j) (KRAFTG0018766-69)).) The Plan also provides:

> The Investment Committee [currently BIC] (or an Investment Manager) may, in its sole discretion, keep any portion of an Investment Fund (or a Subpart thereof) in cash or short-term investments (including a comingled fund of the Trustee) for liquidity purposes, pending the selection and purchase of permanent investments for such Investment Fund (or Subpart thereof) and, in the case of each Subpart designated as forming part of the ESOP Fund, pending the distribution from that Subpart of dividends (but not earnings thereon) from shares of Employer Common Stock to those Participants and Beneficiaries who have elected to have the dividend paid to them rather than reinvested in additional share of such Employer Common Stock (or in units representing such shares).

(App. Tab 21, Youman Decl. ¶ 5, Ex. C (Plan § 6.1 (KRAFTG0001931)).)

44.    More than half of the 401(k) plans that have employer stock funds use a unitized structure for those funds. (App. Tab 29, Miller Dep. 16-18; App. Tab 31(A) Niden Rep. 7-8; App. Tab 31, Niden Dep. ¶ 5.) In addition, open-ended mutual funds are unitized, and there are thousands of such funds available for investors. (App. Tab 29, Miller Dep. 21-22.)

45.    The cash buffer has several benefits, including enabling the CSFs to release funds for a participant to transfer to another investment option without waiting for the sale of stock to clear, a process that normally takes three days. (App. Tab 18, Werner Dep. (9/11/2008) 391-392; App. Tab 4, Dolsen Dep. 187; App. Tab 22, Dolsen Decl. ¶ 18.)

46.    In addition, the cash buffer allows the Plan's trustee, which operates the CSFs, to "net out" participant transactions in order to reduce the CSF's overall brokerage commissions. For example, if a participant wishes to invest in one of the CSFs and another wishes to withdraw his assets from the same fund, the transactions can partially or fully cancel each other out and

eliminate the need to buy or sell the underlying stock on the open market. (App. Tab 4, Dolsen Dep. 262-263; App. Tab 22, Dolsen Decl. ¶ 18.)

47.    The cash buffer also mitigates any decrease in stock price; because the value of the cash buffer is relatively stable, the value of the CSFs will not fall as far as the value of any underlying stock if the stocks decrease in value. (App. Tab 31, Niden Dep. 5, App. Tab 31(A); Niden Rep. 13.)

48.    As reported on the Fund Fact Sheets, the cash buffer for the Kraft Foods Stock Fund (since inception) has not exceeded 5% and the cash buffer for the Altria Stock Fund (since October 2000) has not exceeded 5.16%. (App. Tab 21, Youman Decl. ¶ 10, Ex. D.)

### B.    Plaintiffs Challenge Only The Unitized Nature Of The Company Stock Funds; They Do Not Attack The Funds Fees Or Expenses Or The Level Of The Cash Buffer.

49.    Plaintiffs have limited their claim regarding the CSFs to an assertion that they were inherently imprudent because they did not allow Plan participants to invest exclusively in the underlying company stock. (App. Tab 29(A), Miller Rep. 5-8; App. Tab 29, Miller Dep. 5-8, 10-11, 15, 31-33; Pl. Ans. To Int. Nos. 1, 3, 4, 18, as originally made on 11/23/07 (App. Tab 34) and supplemented on 4/16/08 (App. Tab. 35) and 8/4/08 (App. Tab 37).)

50.    Plaintiffs were asked in an interrogatory to state the basis of their claim regarding the stock funds and they stated as follows (in their initial and supplemental answers):

> Plaintiff states that this claim is based upon Plaintiff's and his representatives' review and analysis of the returns for the Kraft Foods Stock Fund and the Altria Stock Fund, as well as the returns for Kraft Foods stock and Altria stock as those are traded on the open market. Documents, including the Fund Fact Sheets, disclose an amount held as "Cash Reserves," that varies from quarter to quarter, although the composition of the cash or equivalent is not described in any detail. This allegation is also based upon Plaintiffs' representatives' knowledge of the cash management practices in the financial services and 401(k) industries, including the knowledge of expert witnesses. Plaintiff's investigation continues and Plaintiff will supplement this response as he receives further details in the discovery process and with expert reports and testimony within any deadlines set by the Court.

* * *

Plaintiffs supplement this response to Interrogatory No. 18 by incorporating the supplemental response to Interrogatory Nos. 4 and 13 as though fully set forth herein. Further, Plaintiffs state that the fund fact sheets and quarterly statements do not disclose that cash reserves in these unitized funds create a return lag when compared to the common stock in these funds available to the public.

Plaintiffs' investigation continues and specifically reserve the right to supplement this response as the discovery process starts in earnest and with expert reports and testimony within the deadlines set by the Court.

* * *

In addition,…Plaintiffs incorporate herein by reference their supplemental answers to Interrogatory No. 1, 3, and 4.

Per the Court Order of June 30, 2008, Plaintiffs do not supplement these responses with deposition testimony. However, Plaintiffs specifically incorporate their supplementation to this interrogatory with the deposition testimony of those individuals deposed thus far and the respective deposition exhibits. See deposition of Jim Dollive and accompanying deposition exhibits, deposition of Marc Firestone and accompanying deposition exhibits, and deposition of Jill Youman and accompanying deposition exhibits.

No supplementation at this time.

Plaintiffs' investigation continues and specifically reserve their right to supplement this response as the discovery process starts in earnest and with expert reports and testimony within the deadlines set by the Court.

(Pl. Ans. To Int. No. 18, as originally made on 11/23/07 (App. Tab 34) and supplemented on

4/16/08 (App. Tab. 35) and 8/4/08 (App. Tab 37).)

51.    In supplement to Interrogatory No. 3, Plaintiffs further stated that:

Defendants further breached their fiduciary duties by failing to implement and enforce their own recognized fiduciary standards by allowing the company stock funds to maintain and hold cash reserves. … Defendants breached their fiduciary duties by allowing the holding of cash reserves and/or excessive cash reserves in the Kraft Foods Stock Fund and Philip Morris/Altria Stock Fund. See Fund Fact Sheets. Defendants breached their fiduciary duties by failing to retain the services of an appropriately equipped service provider to administer the stock funds and purposefully failed to do so. Further, Defendants breached their fiduciary duties by allowing excessive management fees to be charged and/or incurred for the holding and/or investment of cash and/or other investments in short term investment funds and/or money market funds for the stock funds in the Plan.

(App. Tab 36, Pl. 7/3/08 Supp. Ans. To Int. No. 3, restated in App. Tab 37, 8/4/08 Supp. Ans.

Int. No. 3.)

52.    In supplement to Interrogatory No. 4, Plaintiffs further stated that:

Defendants purposefully and/or improperly failed to inform participants and their
beneficiaries of the Thrift Plan of the appropriate benchmarks for the Kraft Foods Stock
Fund and the Philip Morris/Altria Stock Fund. KRAFTG0267820. See Kraft Foods
Stock Fund and the Philip Morris/Altria Stock Fund, Fund Fact Sheets.

(App. Tab 37, Pl. 8/4/08 Supp. Ans. Int. No. 4.)

53.    Plaintiffs have not identified in their interrogatory answers or expert reports any

facts or information showing the fees and expenses of, or the level of the cash buffer in, the CSFs

were excessive when compared to other similar funds.  (Pl. Ans. Int. Nos. 1-22  as originally

made on 11/30/2007 (App. Tab 34), supplemented 4/16/08 (App. Tab 35), 7/3/08 (App. Tab 36),

and 8/4/08 (App. Tab 37); App. Tab 29, Miller Dep. 15; *see generally* App. Tab 29(A), Miller

Rep.)

54.    In fact, plaintiffs' purported expert Ross Miller testified that he is not offering any

opinion regarding the fees or expenses of the Company Stock Funds or regarding the amount of

the cash buffer that should be maintained in a unitized fund.  (App. Tab 29, Miller Dep. 31-34.)

Instead, his opinion is limited to the conclusion that company stock funds should not have any

cash in them, that is, that they should not be unitized.  (App. Tab 29, Miller Dep. 32-33.)

55.    In addition, Miller admitted that while he believes that the Company Stock Funds

underperformed a number he assumed (but did not verify) was the performance of a stock-only

portfolio, he is unable to offer an opinion with any degree of certainty regarding the cause of that

asserted underperformance.  (App. Tab 29, Miller Dep. 49-53, 52 lns. 14-15 ("It was one of

th[o]se eyeballing types of things."), 223.)

56.    Miller also admits that his claim regarding the cash buffer does not explain any of the alleged losses in the Kraft Stock Fund.  (App. Tab 29, Miller Dep. 49-53.)

57.    In fact, Miller did no calculation to determine whether the unitized structure of the CSFs or the fact that all participants equally share the cost of trades actually harmed any participant.  (App. Tab 29, Miller Dep. 169-170.)

58.    Miller admits that the Plan disclosed the unitized nature of the CSFs and he admits that none of the Plan's disclosures regarding the unitized nature of the CSFs or the amount and operation of the cash  buffer were incorrect.  (App. Tab 29, Miller Dep. 34-39, 218-226.)

59.    Defendants retained Cathy Niden to evaluate Miller's report.  (App. Tab 31, Niden Dep. 5; App. Tab 31 (A), Niden Rep. 3.)  Niden is a Director at LECG, LLC ("LECG"), a leading business and economics consulting firm which provides litigation support services, including expert testimony in the fields of economics and finance.  (App. Tab 31, Niden Dep. 5; App. Tab 31 (A), Niden Rep. 1.)

60.    As set forth in her report, Niden's credentials include that she holds a Ph.D. in finance and economics and an MBA from the Graduate School of Business of The University of Chicago; that she was formerly an Assistant Professor at the College of Business Administration of the University of Notre Dame and at the Joseph M. Katz Graduate School of Business of the University of Pittsburgh (where she he taught courses on financial economics, including principles of Efficient Markets, Modern Portfolio Theory, and the analysis of portfolio risk and return); and that she served as Academic Economic Fellow and Associate Chief Economist at the Office of Economic Analysis of the U.S. Securities and Exchange Commission.  (App. Tab 31, Niden Dep. 5; App. Tab 31 (A), Niden Rep. 1.)

61.    Niden states in her report that unitized company stock funds are not inherently imprudent and in fact are very common in defined contribution plans because of the administrative advantages they offer.  (App. Tab 31, Niden Dep. 5; App. Tab 31 (A), Niden Rep. 7-8.)  Miller agreed with Niden's conclusion on this point.  (App. Tab 29, Miller Dep. 15-17.)

62.    In addition, Niden cited evidence showing that the level of cash or short-term investments in the Plan's CSFs is consistent with the levels of cash maintained by other similar funds.  (App. Tab 31, Niden Dep. 5; App. Tab 31 (A), Niden Rep. 7-8.)  Miller did not contradict Niden's observations in this regard.  (App. Tab 29(A), Miller Rep. 9-17; App. Tab 29, Miller Dep. 15, 16-17, 19-22, 32-33.)

## VII.    The Hewitt Recordkeeping Fee Was Reasonable And Was The Product Of Diligent Negotiations.

### A.    The Hewitt Relationship Began In 1995 As The Result Of A Competitive Bid.

63.    After soliciting proposals from two vendors and engaging Buck Consulting (a company with experience reviewing such proposals), MCEB approved the contracting of Plan administration services to Hewitt effective May 1995.  (App. Tab 20, Youman Dep. (7/30/2008) 133, 137-38, 144-45, 181-82; App. Tab 21, Youman Decl. ¶¶ 22-25, Ex. N-S.)

### B.    In 1998 Hewitt Agrees To Reduce Its Annual Fees.

### C.    In 2000, MCEB Agrees to Extend The Hewitt Agreement After Negotiation and External Review.

65.    In early February 2000, Hewitt made a proposal for a new administrative services agreement (ASA), and offered to renew its contract for either three or five years.  (App. Tab. 24, Armenio Decl. ¶ 9, Ex. A.)  Under a three-year agreement, Hewitt offered to freeze fees at their

current rates; for a five-year agreement, Hewitt offered to reduce its fees in the later years. (App. Tab 24, Armenio Decl. ¶ 9, Ex. A (KRAFTG0471440).)

66.    Buck Consultants was again retained to review the proposed agreement and to evaluate whether it was reasonable. (App. Tab 20, Youman Dep. (7/30/2008) 228-32.)

69.    After obtaining the information regarding the Plan (App. Tab 24, Armenio Decl. ¶ 11, Ex. E), and reviewing the proposed Hewitt agreement, Buck reported, "we can make a general statement that Hewitt's service agreement provisions and schedules seem to be consistent with the standards of the industry and similar vendors," and that while it had not performed a formal fee quote comparison, "[o]n the surface, the fees seem to be fair if Kraft has been satisfied with the level of service." (App. Tab 24, Armenio Decl. ¶¶ 12-14, Ex. F (KRAFTG00471395, KRAFTG00471397).)

70.    During all periods relevant to this case, Kraft Benefits had been very satisfied with Hewitt's service. (App. Tab 21, Youman Decl. ¶ 28.)

71.    Moreover, the Plan is a big, complicated plan, and thus Kraft Benefits wants a record keeper that has experience with similar jumbo size 401(k) plans. (Youman Dep. (7/30/2008) 111.)

72.    On May 22, 2000, MCEB approved a three-year ASA with Hewitt to be effective August 1, 2000. (App. Tab 21, Youman Decl. ¶ 29, Ex. T; App. Tab 24, Armenio Decl. ¶ 19.)

**D.    The 2001-02 Request for Quote ("RFQ") Process Confirmed That Hewitt's Fees Were Reasonable.**

74.    In 2001, after learning that the recordkeeper of Philip Morris' 401(k) plan (the "DPS plan") was getting out of the recordkeeping business, Philip Morris decided to go out to bid for a new recordkeeper for the DPS plan, the Plan, and certain plans sponsored by Nabisco, a company which had been acquired and then merged into Kraft in July 2001. (App. Tab 11, Lawson Dep. 2, 60, 188-89; App. Tab 20, Youman Dep. (7/30/2008) 117, 270-272; App. Tab 11(A), Lawson Dep. Ex. 17 (ALT0020951); App. Tab 3, Dollive Dep. 111-12.)

75.    Kay Yanacheck, Philip Morris Vice President of Benefits, informed Jill Youman of Kraft Benefits of Philip Morris' intentions. Although it was satisfied with Hewitt's performance, Kraft Benefits agreed to have Philip Morris seek bids on the Plan's behalf, and provided the information necessary for Philip Morris to engage in the bid process. (App. Tab 21, Youman Decl. ¶¶ 28, 31; App. Tab 20, Youman Dep. (7/30/2008) 269-70; 276-78; App. Tab 8, Halaburt Dep. 126-27.)

76.    In agreeing to participate in the RFQ, Kraft Benefits was prepared to recommend that MCEB change recordkeepers if the RFQ demonstrated that doing so would be in Plan participants' best interests.  (App. Tab 20, Youman Dep. (7/30/2008) 269-70.)

**E.    In 2002-03 MCEB Renegotiates The Hewitt Fee In Light Of The Nabisco Plan Merger**

80.    On May 21, 2002, MCEB approved the merger of two Nabisco plans into the Plan (to be effective January 1, 2003), approved various Plan design changes, and authorized the Secretary of MCEB to amend the Plan accordingly and to make any necessary changes to the Hewitt agreement.  (App. Tab 21, Youman Decl. ¶ 35.)

81.    As contemplated in the previous two-year extension of the 2000 ASA, MCEB intended to obtain lower rates from Hewitt upon the merger, and Hewitt's recent RFQ response

gave Kraft Benefits a blueprint for what rate could be negotiated.  (App. Tab 24, Armenio Decl.

¶ 21, Ex. J (KRAFTG0010545); App. Tab 21, Youman Decl. ¶¶ 35-37, Ex. U, V.)

**F.**    **The Hewitt Agreement Is Renegotiated In 2006, With The Assistance Of An Independent Consultant.**

87.    In July 2004, Youman retained Gildner to advise Kraft Benefits with respect to the reasonableness of fees and contract language for the upcoming contract negotiations with Hewitt.  (App. Tab 21, Youman Decl. ¶ 46; App. Tab 20, Youman Dep. (7/30/2008) 295-97.)

90.    In October 2004, Kraft Benefits employees Scott Speidel and Martha Pechnyo proposed to Hewitt contract language changes and a new rate structure based upon their discussions with Gildner.  (App. Tab 25, Pechnyo Decl. ¶¶ 15, 18-21, Ex. B.)

95.     Kraft Benefits felt that the agreement resulted in a significant savings for the Plan each year.  (App. Tab 25, Pechnyo Decl. ¶ 27, Ex. E.)

97.     Kraft Benefits' Marti Pechnyo advised Gildner of the proposed agreement.  (App. Tab 25, Pechnyo Decl. ¶ 32.)  Gildner concurred that it was a reasonable agreement.  (*Id.*)

98.     Pechnyo presented a summary of the proposal highlights to Youman and MCEB members Jim Dollive (Kraft's CFO) and Terry Faulk (Kraft's Executive Vice President for

Human Resources). Dollive and Faulk approved the agreement and authorized its execution on behalf of the Plan. (App. Tab 25, Pechnyo Decl. ¶¶ 31, 33, Exs. E and F; App. Tab 21, Youman Decl. ¶ 49.)

**G.      Expert Testimony Further Confirms That Hewitt's Fees Were Reasonable.**

99.      Defendants retained Jennifer Flodin to opine on the reasonableness of the recordkeeping fees paid to Hewitt and the reasonableness of the methods utilized to monitor and evaluate fees. (App. Tab 26(B), Flodin Rep. (dated 12/22/2008) at 5; App. Tab 26, Flodin Dep. 21.)

100.      Flodin's credentials, as set forth in her expert report, include that she holds the Accredited Investment Fiduciary™ (AIF) designation from the Center for Fiduciary Studies, affiliated with the Katz Graduate School of Business, University of Pittsburgh; that she holds a PLANSPONSOR Retirement Professional (PRP) designation from PLANSPONSOR; that she holds a Bachelor of Science degree from the University of Wisconsin – Whitewater; that she is an active member of the Profit Sharing/401(k) Council of America (PSCA); and that since 2002, she has operated a retirement plan consulting firm she co-founded with Don Stone, through which she engages in fee reviews, vendor searches, operational compliance reviews, vendor management, employee education, plan design, benchmarking and plan fiduciary education. (App. Tab 26(B), Flodin Rep. (dated 12/22/2008) at 3; App. Tab 26, Flodin Dep. 21, 55.)

101.      Flodin determined that the recordkeeping fees charged by Hewitt were reasonable through two primary methods -- the same methods she uses when advising her own clients as to whether fees are reasonable. (App. Tab 26 (B), Flodin Rep. (dated 12/22/2008) at 6-9; App. Tab 26, Flodin Dep. 21.)

102.      First, Flodin compared the Hewitt fees to the proprietary data regarding recordkeeping fees her firm maintains and updates based upon their experience in the industry.

(App. Tab 26, Flodin Dep. 229-34, 243.) This data originated as a tool used by Stone's former employer, a bank, to price recordkeeping services for plans of all sizes, and it includes information about plans with 25,000 or more participants. (App. Tab 26, Flodin Dep. 233-34, 241-45.) Flodin and Stone use this data to compare what they see in the industry and update it as necessary. (App. Tab 26, Flodin Dep. 231, 243.)

103.    Flodin is also aware of recordkeeping fees based upon discussions with vendors and wholesalers, by attending conferences, talking to peers, and working with clients. (App. Tab 26, Flodin Dep. 275-76.)

104.    Based upon proprietary data for plans with at least 25,000 participants and her industry experience, Flodin developed a range of recordkeeping fees she believes would be reasonable for the Plan. (App. Tab 26(B), Flodin Rep. (dated 12/22/2008) at 7-9; App. Tab 26, Flodin Dep. 21, 259-60.) Based on her own calculation of what Hewitt charged the Plan for basic recordkeeping fees, she found that Hewitt's fees were reasonable. (App. Tab 26(B), Flodin Rep. (dated 12/22/2008) at 7-8; App. Tab 26, Flodin Dep. 15.)

105.    Second, Flodin compared the Plan's recordkeeping fees to fees obtained from 19 fee quotes provided to other plans with similar numbers of participants and similar assets. Based upon this comparison, Flodin concluded that the fees paid by the Plan were reasonable. (App. Tab 26(B), Flodin Rep. (dated 12/22/2008) at 8-9; App. Tab 26, Flodin Dep. 15.) In performing this comparison, Flodin made every effort to calculate the basic recordkeeping fee for each quote in order to permit a proper comparison although in some circumstances certain non-base items in the Hewitt agreement or in the fee quotes could not be carved out. (App. Tab 26(B), Flodin Rep. (dated 12/22/2008) at 8-9; App. Tab 26, Flodin Dep. 15, 429-432.)

106.    Defendants' expert witness Chris Flynn testified that the total asset size of a plan is the principal driver of plan cost. (App. Tab 27(A), Flynn Rep. at 2; App. Tab 27, Flynn Dep. 15, 31, 197.)

107.    Plaintiffs' purported expert Larry Johnson formerly ran a recordkeeping business. This business, however, did not involve plans similar to the Plan. Instead: (i) Johnson's clients' plans had on average 400-600 participants with 60-70 million in assets (App. Tab 28, Johnson Dep. 12, 56); (ii) the largest had 8,000 participants, the next highest had 5-6,000 participants, and the third highest had just over 2,000 participants (App. Tab 28, Johnson Dep. 38-39, 56-57); (iii) the largest plan his firm ever bid on was "maybe" 15,000-20,000 participants (App. Tab 28, Johnson Dep. 97-98); and (iv) his company was in the mid-size market, not the large plan market (App. Tab 28, Johnson Dep. 98).

108.    Johnson has no knowledge or experience regarding how large plans (such as the Plan) or even smaller plans monitor fees. Indeed: (i) his company never conducted or assisted in a request for proposal process or reviewed recordkeeping agreements to determine the reasonableness of fees (App. Tab 28, Johnson Dep. 34-36); (ii) he did not advise his client plans that charged fees to participants to do RFPs (App. Tab 28, Johnson Dep. 72-73); (iii) he does not know whether the two or three small plans he worked with that charged fees to participants ever went out to bid for recordkeeping (App. Tab 28, Johnson Dep. 22, 70-71); (iv) he is only aware that the 5-6,000 participant plan checked his pricing twice in 19 years (using means he does not know), and that he gained and lost that client pursuant to an RFP (App. Tab 28, Johnson Dep. 59, 63-65); and (v) he has no knowledge regarding whether, how often, or in what manner his own clients went out for bid or reviewed the reasonableness of his fees (App. Tab 28, Johnson Dep. 72-73).

109.    When Johnson advised his clients about fees charged by other service providers, he typically would simply provide his opinion and would not suggest an RFP or other bid process.  (App. Tab 28, Johnson Dep. 154-57.)

110.    Johnson opines that plan fiduciaries breach their fiduciary duties if they do not go out for bid every three years, based upon his personal opinion, his experience (as described above), certain Department of Labor ("DOL") materials he has read, and a white paper written by Jennifer Flodin's business partner.  (App. Tab 28, Johnson Dep. 73-75.)  Johnson admits, however, that he cannot point to a single document that says it is imprudent not to go out for bid every three years, that he is unaware of anything from the DOL that says that a fiduciary must do an RFP every three years, and that he is not aware of any DOL guidance which states that the only way to determine the reasonableness of fees for a service provider is to do an RFP.  (App. Tab 28, Johnson Dep. 77-81.)

111.    Johnson's opinion ignores several methods commonly used to assess whether fees are reasonable including: benchmarking using industry data and review of third party data. (App. Tab 26(B), Flodin Rep. (dated 12/22/2008) at 10; App. Tab 26, Flodin Dep. 15; App. Tab 13, Mayer Dep. 63-66; App. Tab 11, Lawson Dep. 35-40, 191-95.)

112.    Johnson believes that a reasonable recordkeeping fee for the Plan would have been no more than $27 per participant based solely on what he believed his former company might be able to charge for basic services (App. Tab. 28, Johnson Dep. 299-306), which he admits would not include all of the services provided under the Hewitt agreement.  (App. Tab 28, Johnson Dep. 314-26.)

113.    Mr. Johnson also admittedly: (i) has never advised clients on the market rate for recordkeeping services to a plan of the size of and complexity of the Kraft Plan; (ii) maintains no

database of what different companies charge for recordkeeping services for plans of the Plan's size; (iii) has never gone out for bid for the Plan and his company never bid on a plan the size of the Plan; and (iv) has no knowledge as to whether any recordkeeper that is capable of serving a plan the size of the Plan would ever charge the rate he opines is reasonable. (App. Tab 28, Johnson Dep. 303-04, 345-46.)

## VIII. There Was Nothing Imprudent Or Improper In State Street's Retention Of Float.

### A.    State Street's Retention Of Float With Respect To The Master Trust.

114.    When a plan makes a payment by check, such as a benefit payment to a participant or beneficiary, the plan trustee typically sets aside funds sufficient to cover the amount of the check in a non-interest-bearing checking account at a bank (often an affiliate of the trustee). (App. Tab 30, Myers Dep. 10-11; App. Tab 30(A), Myers Rep. at 3.)  Until the check is presented to the bank for payment, these funds have the potential to earn income. This income is referred to as float. (App. Tab 30, Myers Dep. 10-11; App. Tab 30(A), Myers Rep. at 3.)

115.    "Float" is best understood as not being actual income to the bank, but rather as a savings to the bank (measured bank's internal cost of funds, *i.e.*, the approximate cost to the bank of borrowing the same amount from the Federal Reserve banking system, or a short-term money market interest rate) because float reduces the need to borrow federal funds in order to sustain a certain level of capital reserves. (App. Tab 30, Myers Dep. 10-11; App. Tab 30(A), Myers Rep. at 3.)

116.    Float often is treated as part of a bank's compensation for providing trust services to a plan. (App. Tab 30, Myers Dep. 10-11; App. Tab 30(A), Myers Rep. at 3.)  If a trustee did not retain the float, it would charge higher service fees to the plan for its services. (App. Tab 30, Myers Dep. 10-11; App. Tab 30(A), Myers Rep. at 3.)

117.    Given the nature of float, plan fiduciaries may conclude that plan resources are better focused on selecting a trustee who provides superior service than shopping around for a better deal with respect to float.  (App. Tab 30, Myers Dep. 190-92, 206; App. Tab 18, Werner Dep. (9/11/2008) 490-91.)

118.    Mark Werner testified that, in his experience, the Trustee's compensation will "come out to about the same" regardless of whether the Plan or the Trustee keeps the float. (App. Tab 18, Werner Dep. (9/11/2008) 490-91.)

119.    Plaintiffs have expressly limited their claims regarding float to the period of time when State Street was the trustee. *See* Mar. 19 2009 Joint Statement (Docket # 215); transcript of March 4, 2009 Hearing (Docket #217) at 10-11 (plaintiffs' counsel stipulating that their claims did not exceed what was stated in their February 6, 2009 letter.)

120.    Since it became Trustee in 2003, State Street has held the Plan's assets and has been compensated for a variety of services, including custodial services, reporting, and making disbursements to Plan service providers and to Plan participants.  (App. Tab 22, Dolsen Decl. ¶¶ 8, 9.)

121.    State Street's fee schedule for the handling of disbursements from the Master Trust  provides that the Plan will pay State Street a base fee for its services as well as per-item fees for services such as preparation of participant distribution checks and it specifically discloses:

> "As part of our disbursement services, Deutsche Bank Trust Company Americas ("DB") [2] arranges for the issuance of benefit and other checks against a DB disbursement account.  The DB disbursement account is funded for these checks from your account on the payable date of the check.  Between the payable date of the check and the date the check is presented, interest is earned by DB on

---

[2]  State Street assumed the agreement from DB. *See* supra ¶ 15.

the balance in the omnibus disbursement account. This interest is part of DB's overall compensation. We provide a monthly report on the status of the outstanding checks."

(App. Tab 22, Dolsen Decl. ¶ 13, Ex. E.)

122.    State Street consistently disclosed that it was retaining float earned with respect to the Master Trust and provided annual disclosures of the amount of float. (App. Tab 23, Werner Decl. ¶ 11; (KRAFTG0022665); App. Tab 22, Dolsen Decl. ¶¶ 11, 12, 14, 16, Ex. D; App. Tab 4, Dolsen Dep. 168-69.)

123.    On its invoices, State Street specifically disclosed the circumstances under which float will be earned and retained, when the float period commences and ends, the type of interest rate State Street used to value the float, and that an alternative, higher fee schedule is available under which State Street does not retain the float. (App. Tab 22, Dolsen Decl. ¶ 15, Ex. F.)

**B.    Plaintiffs Offer No Evidence That State Street's Compensation Was Unreasonable Or That Its Retention Of Float Harmed The Plan In Any Way.**

124.    Plaintiffs were asked by interrogatory to "[s]tate all facts that support your claim that defendants caused the [Plan] to enter into agreements with service providers under which the Plan pays/paid – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants or beneficiaries." (Pl. Ans. Int. No. 1 (Originally dated 11/30/2007 (App. Tab 34) and supplemented 4/16/2008 (App. Tab 35), 7/3/2008 (App. Tab 36), and 8/4/2008 (App. Tab 37)).) Despite providing four sets of answers to this interrogatory, plaintiffs never identified any entity that was paid fees that were unreasonable or not incurred solely for the benefit of Plan participants or beneficiaries for acting as the Plan's trustee or for performing related functions. *Id.*

125.    Plaintiffs never identified any evidence in their interrogatory answers to support their claim that defendants failed "to monitor and account for earnings on funds being

contributed to and/or disbursed from the Plan (*i.e.*, "float")." (Pl. Ans. Int. No. 1-22 (Originally

dated 11/30/2007 (App. Tab 34) and supplemented 4/16/2008 (App. Tab 35), 7/3/2008 (App.

Tab 36), and 8/4/2008 (App. Tab 37)).)

126.    Plaintiffs retained David Witz to opine on the propriety of State Street's retention

of float. (App. Tab 32(A), Witz Rep. at 13-16; App. Tab 32, Witz Dep. 12). Witz offers no

opinion regarding the reasonableness of State Street's compensation or on the damages caused to

the Plan by State Street's retention of float. (App. Tab 32, Witz Dep. 12, 119; App. Tab 32(A),

Witz Rep. at 13-16.)

127.    Defendants retained Donald Myers to review Witz' conclusions regarding float.

As set forth in his report, Myers' credentials include that he received a J.D. from Cornell Law

School and an LLM in Taxation from Georgetown University Law Center; that he served as

Special Assistant and Counsel for ERISA Regulation at the Office of the Solicitor of the U.S.

Department of Labor from 1975-1984; that his private law practice primarily focuses on the

fiduciary responsibility provisions of ERISA (advising both plan trustees and plan service

providers); that he is a Charter Fellow of the American College of Employee Benefits Counsel

and a Board Member of the BNA Pension and Benefits Advisory Board; and that he has authored

a number of publications and has given a number of speeches on fiduciary responsibilities,

including sections of the publication *ERISA Fiduciary Law* regarding trusts and trustee

responsibility. (App. Tab 30, Myers Dep. 10-11, 25, 27; App. Tab 30(A), Myers Rep. at 1-2 and

Appx. A.)

128.    Myers determined that Witz's conclusions were either not supported by the

evidence in this case or misapply applicable law. (App. Tab 30, Myers Dep. 10-11; App. Tab

30(A), Myers Rep. at 2.)

129.    Myers concluded that it is common practice for 401(k) trustees to retain float as part of their compensation.  (App. Tab. 30, Myers Dep. 213-214.)

130.    Witz does not contradict this statement and in fact acknowledged that his various employers over the years retained float earned with respect to any plans where they acted as trustee.  (App. Tab 32, Witz Dep. 58-60, 66-67, 77-78.)  Witz further acknowledged that his firm and other firms were capturing float as a way to pay for trustee services.  (App. Tab 32, Witz Dep. 58.)

**DATED:  May 22, 2009**

Respectfully submitted,

KRAFT FOODS GLOBAL, INC.; KRAFT FOODS
GLOBAL, INC. ADMINISTRATIVE
COMMITTEE; BENEFITS INVESTMENT
COMMITTEE; JIM DOLLIVE; KAREN MAY;
MARC FIRESTONE; and PAMELA KING

*/s/Ronald J. Kramer*
One of Their Attorneys

Ronald J. Kramer (rkramer@seyfarth.com)
Ian H. Morrison (imorrison@seyfarth.com)
Amanda A. Sonneborn (asonneborn@seyfarth.com)
Sam Schwartz-Fenwick (sschwartz@seyfarth.com)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, IL 60603
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that on May 22, 2009, he caused a copy of this LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE to be presented to the Clerk of the Court for filing and uploading to the CM/ECF system, which will send notification of such filing to the following CM/ECF registrants:

> Jerome Schlichter (jschlichter@uselaws.com)
> Nelson G. Wolff (nwolff@uselaws.com)
> Troy A. Doles (tdoles@uselaws.com)
> Jason P. Kelly (jkelly@uselaws.com)
> Schlichter Bogard & Denton LLP
> 100 S. 4th Street, Suite 900
> St. Louis, Missouri 63102
> (314) 621-6115
>
> Thomas R. Meites (tmeites@mmbmlaw.com)
> Meites, Mulder, Mollica & Glink
> 20 S. Clark Street, Suite 1500
> Chicago, Illinois 60603
> (312) 263-0272

> /s/ *Ronald J. Kramer*
> Ronald J. Kramer