# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

GERALD GEORGE, *et al.*,                )
                                         )
        **Plaintiffs,**                  )
                                         )
v.                                       )
                                         )
KRAFT FOODS GLOBAL, INC., *et al.*,      )
                                         )
        **Defendants.**                  )

**Case No. 07 C 1713**

**Magistrate Judge Sidney I. Schenkier**

## MEMORANDUM OPINION AND ORDER[1]

Plaintiffs, individually and as representatives of a class, filed this action on behalf of the Kraft Foods Global Inc. Thrift Plan, Plan No. 125 (the "Plan"), alleging that defendants breached their fiduciary duties in operating and administering the Plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiffs seek to recover alleged losses suffered by the Plan and to obtain injunctive and other equitable relief based upon the alleged breaches (Compl.¶ 10). Plaintiffs named as defendants: Kraft Foods Global, Inc. ("Kraft"); Kraft Foods Global, Inc. Administrative Committee ("Administrative Committee" or "KFAC"); Kraft Foods Global, Inc. Benefits Investment Committee ("BIC"); and the individual members of BIC – Jim Dollive, Karen May, Marc Firestone, and Pamela King.

In an earlier ruling, the Court struck plaintiffs' jury demand. *George v. Kraft Foods Global, Inc. ("Kraft I")*, Nos. 07 C 1713, 07 C 1954, 2008 WL 780629 (N.D. Ill. Mar. 20, 2008). Thereafter, on July 17, 2008, this Court certified a class of "[a]ll persons who were participants or beneficiaries of the Plan, all current participants and beneficiaries of the Plan, and those who will become

---

[1]On May 30, 2007, by consent of all parties and pursuant to 28 U.S.C. § 636(c), the case was reassigned to this Court for all proceedings, including entry of final judgment (doc. ## 57, 68).

participants of the Plan in the future," excluding the named defendants and their officers and directors. *George v. Kraft Foods Global, Inc.* ("*Kraft II*"), 251 F.R.D. 338, 353 (N.D. Ill. 2008). Defendants now have filed a motion for summary judgment on all of plaintiffs' claims (doc. # 222).[2] For the reasons set forth below, this motion is granted.

## I.

We begin with the well-established legal standards governing summary judgment motions. Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The party seeking summary judgment bears the burden of establishing that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). To withstand a motion for summary judgment, the non-moving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case. *Id.* at 323. The Court will construe the evidence and all reasonable inferences in favor of the non-moving party. *Durable Mfg. Co. v. U.S. Dep't of Labor*, 578 F.3d 497, 501 (7th Cir. 2009). When a material fact or set of facts yields competing, but reasonable, inferences, then

---

[2]Defendants also argue that plaintiffs' complaint does not state a claim upon which relief can be granted (doc. #224: Defs.' Mem. at 4). On April 1, 2009, we rejected that argument in striking defendants' motion for judgment on the pleadings because the time for a motion based on the pleadings has long passed, and a great deal of discovery has already occurred (doc. # 236: 4/1/09 Tr. at 8-9). We adhere to our earlier decision on this issue.

2

there is a genuine issue that precludes summary judgment. *Coles v. City of Chicago*, 361 F. Supp. 2d 740, 741-42 (N.D. Ill. 2005).

In this district, Local Rule 56.1 provides the framework through which parties lay out the material facts that support or oppose summary judgment. The Court deems the properly supported material facts set forth in the parties' statements to be admitted unless they are properly controverted by the statement of an opposing party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006); L.R. 56.1(a)(3); L.R. 56.1(b)(3)(c). Here, defendants object to certain portions of plaintiffs' response to defendants' statement of facts and plaintiffs' statement of additional facts as violating Local Rule 56.1; however, rather than move separately to strike them, defendants ask the Court to find that plaintiffs' factual assertions do not create a genuine material issue (doc. #240: Defs.' Reply at 2). Although this Court is entitled to demand strict compliance with its Local Rules, whether to do so is entrusted to our discretion. *Amnions v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

Specifically, defendants assert that plaintiffs' response to their statement of facts violates Local Rule 56.1(b)(3)(B), insofar as plaintiffs not only admit or deny certain facts asserted by defendants but also state additional facts in their responses (Defs.' Reply at 2-3). Defendants also argue that plaintiffs' responses contain improper argument and objections as well as improper or insufficient citations to the evidentiary record (*id.*). Furthermore, defendants argue that plaintiffs improperly assert legal conclusions in their statement of additional facts in violation of the local rules. Many of these criticisms are well-taken. However, the Court is able to separate plaintiffs' alleged facts from their characterizations of or conclusions drawn from those facts. In addition, although the Court will not consider the additional facts improperly alleged in plaintiffs' responses,

3

many of these facts are properly asserted elsewhere, where the Court may consider them. Therefore, we deny defendants' request to deem their statement of facts admitted as a result of plaintiffs' alleged violations of Local Rule 56.1.

## II.

In light of these summary judgment standards, we turn to the material facts that are relevant to the motion for summary judgment, as taken from defendants' statement of material facts ("DSOF") (doc. # 223) and plaintiffs' statement of additional facts ("PAF") (doc. # 238). The facts set forth below are undisputed unless otherwise noted by the Court.[3] We discuss only admissible evidence, as only admissible evidence may support or defeat a summary judgment motion. *Lewis v. CITGO Petroleum Corp.* 561 F.3d 698, 704 (7th Cir. 2009); *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003).

## A.

Kraft sponsors the Plan, and offers its employees the chance to participate in it as part of their compensation and benefits package. The Plan is a tax qualified "defined contribution plan" which contains an employee stock ownership plan, also known as a "401(k)" plan (DSOF ¶ 3). Kraft and participating employees contribute to the Plan; the named plaintiffs are current or former participants (DSOF ¶¶ 2-3). Between 2000 and 2006, the Plan had between 37,000 and 55,000 participants, and held between $2.7 and $5.4 billion in assets (DSOF ¶ 4).

---

[3]In determining what is disputed, we focus not merely on the parties' statements, or whether they profess to dispute a fact, but also on the evidence the parties offer to support their statements. When we cite as undisputed a statement of fact that a party has attempted to dispute, that reflects our determination that the evidence does not show that the fact is in genuine dispute.

4

The "Kraft Foods Thrift Plan" ("the Plan document") is the document that established the Plan and controls its operation. The Plan document has been amended and restated several times over the years. Under the Plan, defendants each had various responsibilities. From January 1, 1997, to July 1, 2008, the Management Committee for Employee Benefits ("MCEB") administered the Plan, but delegated to defendant KFAC the authority and discretion to control the non-investment operations and administration of the Plan (DSOF ¶¶ 6, 9; Defs.' Ex. 21, Decl. of Jill Youman, ("Youman Decl.") Ex. F, 4/6/98 Summary Plan Description Prospectus ("SPD") (collectively, "Defs.' Ex. 21-F") at 36). MCEB is composed of Kraft officers appointed by the Kraft Board of Directors (Defs.' Ex. 21-F at 36; Youman Decl., Ex. G, 1/1/01 SPD ("Defs.' Ex. 21-G") at 35). MCEB and KFAC, based on its delegated power, have the full power and authority to interpret the provisions of the Plan document (*id.*; Youman Decl., Ex. I, 10/21/05 SPD ("Defs.' Ex. 21-I") at 40). The members of MCEB and KFAC serve without fee or compensation, and their expenses are paid by Kraft (*id.*). On July 1, 2008, the Plan was amended to allocate the responsibility for non-investment operations and administration directly to KFAC (DSOF ¶¶ 6, 9). KFAC delegated at least part of its responsibilities for day-to-day administration of the Plan to the Kraft Foods Benefits Department (DSOF ¶ 8). MCEB and the Kraft Board of Directors had the authority and right to amend, suspend, or terminate the Plan, in whole or in part, or to discontinue Kraft matching contributions at any time (Defs.' Ex. 21-F at 38).

As part of their responsibilities, MCEB and KFAC had the discretionary authority to adopt rules of procedure and regulations as necessary to administer the Plan; to enforce the Plan in accordance with its terms and the applicable rules and regulations; to "determine conclusively all questions arising under the Plan including . . . to make factual findings and to remedy ambiguities,

5

inconsistencies or omissions of whatever kind . . . ;" to perform the functions of a "plan administrator;" and to employ agents, attorneys, accountants or other persons as necessary or desirable to discharge their duties (DSOF ¶ 12; Youman Decl., Ex. C, 1/1/03 Kraft Thrift Plan ("Defs.' Ex. 21-C") § 13.1). Prior to July 1, 2008, MCEB had the authority to revoke the delegation to KFAC, and KFAC had a duty to periodically report to MCEB on the exercise and discharge of its responsibilities (DSOF ¶ 12; Defs.' Ex. 21-C §§ 13.1-13.2).

From January 1, 1997, to November 1, 2001, responsibility over the investment operations of the Plan rested with the Corporate Employee Plans Investment Committee of Philip Morris Companies, Inc.; and from November 1, 2001, to January 27, 2004, this authority was vested in the Compensation and Governance Committee of the Board of Directors of Kraft Foods Inc. (DSOF ¶¶ 5, 10; Youman Decl., Ex. A, 1/1/97 Kraft Thrift Plan ("Defs.' Ex. 21-A") § 1.3; Ex. 21-C § 1.3). On January 27, 2004, the Plan was amended again, vesting the authority to control and manage the investment operations in defendant BIC (DSOF ¶ 10). The individual members of BIC consisted of defendants: (1) Jim Dollive, Executive Vice President and Chief Financial Officer (from January 27, 2004, to October 31, 2007); (2) Karen May, Executive Vice President, Global Human Resources (from January 2006 to June 25, 2008); (3) Marc Firestone, Executive Vice President, Corporate and Legal Affairs and General Counsel (from January 27, 2004, to June 25, 2008); and (4) Pamela King, Senior Vice President and Controller (from July 2006 to the present) (DSOF ¶¶ 10-11; Defs.' Ex. 21-F at 37; Defs.' Ex. 21-G at 36).

The investment committee (either BIC or its predecessors) is responsible for selecting the investment funds offered under the Plan, determining the advisability of establishing or modifying the description of any fund, establishing investment guidelines, and monitoring the investment

6

performance of each of the investment funds (DSOF ¶ 10; Defs.' Ex. 21-F at 37). Under the Plan, BIC may allocate or delegate its responsibilities and powers to its members or other persons selected by it, provided that BIC monitors them, and the entity or individual exercising BIC's responsibilities and powers periodically reports to BIC on the exercise and discharge of such responsibilities (DSOF ¶ 10; Defs.' Ex. 21-C § 6A.2). Neither BIC nor its delegate had a duty to report to Kraft or its Board of Directors and, conversely, those entities had no duty to monitor BIC or the delegate (*id.*). Kraft had the authority to remove BIC members only by amending the Plan to add to or remove from the list of positions that make up the investment committee (*id.* § 6A.7).

The investment committee is also responsible for appointing and removing the trustee, whose duties are to receive all employee or employer contributions to the Plan and to hold, manage, invest, reinvest, and distribute the funds in accordance with the instructions and directions of the investment committee (Youman Decl., Ex. H, 1/1/03 SPD ("Defs.' Ex. 21-H") at 31). The investment committee is further responsible for directing the trustees with respect to the investment of the investment funds and monitoring the investment managers it appointed for the investment funds (DSOF ¶ 10; Defs.' Ex. 21-C § 6A.1).

The assets of the Plan – including participant contributions, Kraft matching contributions, and the investment of returns from the contributions, less payments made by the trustee – are held in the Kraft Foods Master Defined Contribution Trust ("Master Trust") (DSOF ¶ 14). Prior to August 1, 2003, Deutsche Bank Trust Company Americas ("Deutsche Bank") was the Trustee; after that date, State Street Bank and Trust Company ("State Street") assumed the role of Trustee (DSOF ¶ 15).

7

BIC generally meets quarterly to review the performance of the Plan's investment options and compare that performance to a benchmark index (DSOF ¶ 29). Until March 30, 2007, when Kraft was spun off its then parent, Altria Group, Inc. (formerly known as Philip Morris Companies, Inc.), BIC delegated the administrative oversight of the Master Trust and the tracking of investment and other expenses of the Plan to the Benefit Investment Group of Altria Corporate Services, Inc. ("ALCS Benefit Investments"), which was led by Mark Werner, Vice President of Altria Corporate Services (DSOF ¶¶ 31-32). ALCS Benefit Investments oversaw the investment managers that managed portfolios in the pension and 401(k) plans and reported on investment performance to BIC (DSOF ¶ 34). After March 30, 2007, BIC delegated these responsibilities to the newly created Benefit Investments Group of Kraft ("Kraft Benefit Investments"), led by Michael Dolsen (DSOF ¶ 33).

Kraft, KFAC, BIC, and BIC's members are named fiduciaries in the Plan (Youman Decl., Ex. B, 12/15/01 Kraft Thrift Plan ("Defs.' Ex. 21-B") § 1.3; Ex. 21-C § 6A.1). Kraft has the authority to fill any vacancy in the membership of the committees, and either Kraft or the committees may terminate the Plan or amend it from time to time (Defs.' Ex. 21-A §§ 13.10, 14.1). Any interpretation of the Plan by these fiduciaries on any matter within their discretion is binding on all persons (DSOF ¶ 13).

## B.

The Plan offers several multi-stock investment fund options as well as two Company Stock Funds ("CSFs"). Individual participants direct their investments into the different funds (DSOF ¶¶ 12, 16; Defs.' Ex. 21-C). Participants' initial decision as to what percentage of their contributions should go into which investment fund is considered a continuing direction until the participants

change their investment direction for future contributions or reallocate the existing balances in their accounts (Defs.' Ex. 21-C, §§ 6.3, 6.4).

1.

The CSFs invest solely in employer securities. They include the Kraft Foods Stock Fund (added November 1, 2001), and the Altria Group Stock Fund (formerly named Philip Morris Stock Fund), which was discontinued on March 31, 2007, pursuant to the spin-off of Kraft from Altria (DSOF ¶ 17). The CSFs are "unitized funds"; that is, the CSFs hold both employer common stock and some cash or short-term investments (the "cash buffer"), and participants own "units" of the funds rather than specific, identifiable shares of stock or amounts of cash (DSOF ¶ 42). According to the Plan document, the investment committee had discretion to keep any portion of an investment fund in cash or short-term investments (including a commingled fund of the Trustee) for liquidity purposes, pending the distribution of dividends or the selection and purchase of permanent investments for the investment fund (DSOF ¶ 43; Defs.' Ex. 21-C § 6.1). In January 2004, in addition to the option of holding cash for "liquidity purposes," the amended Plan document stated that the cash reserves were to be "held solely as needed for administrative purposes" (Defs.' Ex. 21-C § 6.1 (Jan 2004 Amend.)). "Administrative purposes" do not appear to be substantively different then "liquidity purposes," as cash reserves held for "administrative purposes" are also held pending distribution of dividends (id.). The cash buffer for the Kraft Foods Stock Fund has never exceeded five percent, and the cash buffer for the Altria Group Stock Fund never exceeded 5.16 percent (DSOF ¶ 48).

The investment committee has discretion to establish special rules for valuing the stock portion of the CSFs in case of unusually high trading volume or a temporary suspension of trading

9

in the stock (Defs.' Ex. 21-C § 7.2 (Jan. 2004 Amend.)). To avoid penalizing the value of the CSF out of which a participant is transferring, the Trustee may use the "weighted average sale price" to value all transfer requests out of a fund for that day, rather than the closing or composite price, if the shares are sold at a lower price (Defs.' Ex. 21-H at 16-17).

Summary Plan Descriptions ("SPDs") are available online and hard copies are issued to newly eligible Plan participants; in addition, hard copies were furnished to all participants in 1995 and 2001, and a computer disk containing the SPDs was issued in 2003 (DSOF ¶ 22). The SPDs state that CSFs contain "the greatest amount of risk," that the participants are under no obligation to invest in them, and that "[i]t is generally unwise to overly concentrate the balance in your accounts in an investment fund that holds a single security or in any single investment fund" (DSOF ¶¶ 20-22, Defs.' Ex. 21-F at 12; Defs.' Ex. 21-H at 12). The SPDs explain that the CSFs' value depends on the market value of the common stock and the value of temporary investments in the short-term cash reserve account (*id.* at 13). Participants may elect to reinvest their dividends paid on shares of CSFs or to receive their dividends in cash (*id.*).

Further, the January 2003 SPD explained that the value of the CSFs may be affected by the "cash reserve, income earned on the cash, and other trust activities" which "generally account for small differences in the rate of return" (Defs.' Ex. 21-H at 16). That SPD also disclosed that inter-fund transfer activity – *i.e.*, transfers of assets into and out of CSFs – may occasionally have a greater impact on the valuation of the CSFs (*id.*). The October 2005 SPD explained that unlike the other funds offered by the Plan, the CSFs did not have an investment manager because the "stock is purchased or sold by the Plan's trustee based on plan participant investment elections" (Defs.' Ex. 21-I at 18). For the other investment fund options containing multiple stocks, the investment

10

managers monitored the fund's performance and determined the advisability of establishing or modifying the investment funds (Defs.' Ex. 21-C § 1.3).

**2.**

During the relevant time period, Plan participants were also able to invest in funds that, unlike the CSFS, did not consist exclusively of employer securities and cash. Specifically, the Plan's other investment options included: the Government Obligations Fund, Interest Income Fund, U.S. Large Cap Equity Index Fund, Balanced Fund, International Equity Fund, Euro Equity Fund, Mid-Small Cap Equity Fund (added June 30, 2005), and Growth Equity Fund (removed June 30, 2005) (DSOF ¶ 17). For these funds, Kraft offered investment advice through an investment manager to participants upon request (Defs.' Ex. 21-C § 6.6). Since 2002, the Plan has offered participants the opportunity to use the services of an independent online financial advisor – Financial Engines – to assist them with making investment choices (DSOF ¶ 27). The investment committee or investment manager had the discretion to add or delete investment funds, or to change the investment strategy of a particular investment fund, without prior notice to participants (Defs.' Ex. 21-A § 6.1).

**C.**

Maintenance of the Plan required Kraft to retain the services of a recordkeeper. Hewitt Associates ("Hewitt") has been the Plan's recordkeeper since May 1995, when Kraft employed Buck Consultants ("Buck") to conduct a request for proposal ("RFP") from Hewitt and Bankers Trust (DSOF ¶ 63). Prior to 1995, the Plan provided fewer recordkeeping services and investment options, and performed certain recordkeeping functions in-house (Youman Decl. ¶ 21). The agreement with Hewitt (who through the RFP process was selected over Bankers Trust) increased recordkeeping expenses from $1.9 million annually, and increased the frequency of account valuation from monthly

11

to daily (Youman Decl. ¶¶ 24-25, Exs. Q-R, MCEB Agenda). Because the expenses of administering the Plan are paid from Plan assets, the fees of recordkeepers, investment managers, consultants, and other service providers are shared between all Plan participants regardless of the particular Plan funds in which they invest. *Kraft I*, 251 F.R.D. at 342. Recordkeeping fees are the dominant component of administrative costs, and they are charged to participants on a percentage of assets basis (PAF ¶ 27).

In November 1998, Hewitt's fees were reduced by $42,000.00 per year in exchange for the Plan prepaying part of Hewitt's fees (DSOF ¶ 64). In early February 2000, Hewitt made a proposal for a new administrative services agreement with Kraft ("ASA"), and offered to renew its contract for either three or five years. Under the three-year proposal, Hewitt offered to freeze its fees at their current rates; under the five-year proposal, Hewitt offered to reduce its fees in later years (DSOF ¶ 65). Kraft retained Buck to review the proposed agreements and earlier contracts between Kraft and Hewitt (DSOF ¶¶ 63, 66). Buck typically recommends that their clients conduct an RFP with other recordkeepers to determine the reasonableness of fees only if the clients are dissatisfied with their current recordkeeper, or if Buck's analysis suggests that the proposed fees are not competitive (DSOF ¶ 68). The parties do not state whether Buck actually recommended RFP in this case. But, Buck opined that Hewitt's proposed ASA "seem[ed] to be consistent with the standards of the industry and similar vendors," and that "[o]n the surface, the fees seem to be fair if Kraft has been satisfied with the level of service."

Buck further stated that "Hewitt does not appear to be passing on the savings gained from the increased efficiency of their service team's experience with the plans and plan participants," and that "without an actual fee quote comparison, [Buck] [could not] comment on the competitiveness

12

of the fee amount for the services provided" (DSOF ¶ 69; PAF ¶¶ 34-38). Buck suggested that Kraft include a provision in the ASA that provided for an opportunity to decrease the per participant fee should the number of Kraft participants increase by more than 10 percent (PAF ¶ 38). On May 22, 2000, MCEB approved a three-year ASA with Hewitt. That ASA did not contain the precise tiered fee decrease that Buck suggested, but it contained language stating that an increase of eligible employees by 10 percent may result in a decrease in fees (DSOF ¶ 72; PAF ¶ 39).

In 2001, the Philip Morris 401(k) plan retained Gildner and Associates ("Gildner") to assist in the bid process for a new recordkeeper. Ms. Youman, Vice President of Human Resources in the Kraft Foods Benefits Department ("Kraft Benefits"), agreed to have Gildner seek bids on the Plan's behalf as well (DSOF ¶¶ 74-77). Gildner reported that it saw "no compelling reason to make a change" in the Plan's recordkeeper (DSOF ¶ 78). While the Philip Morris plan hired Fidelity, Kraft maintained Hewitt as its recordkeeper (DSOF ¶ 79). On June 6, 2001, the Plan and Hewitt entered into a two-year extension of the 2000 ASA – to December 31, 2005 – with a $1.00 per participant per year ("pppy") fee reduction (to $56.00 pppy) effective August 2003, and a further $1.00 pppy fee reduction effective August 2004 (DSOF ¶ 73; Defs.' Ex. 24, Armenio Decl., Ex. J., Hewitt letter).

On May 21, 2002, MCEB approved the merger of two Nabisco plans into the Plan. Kraft renegotiated with Hewitt as contemplated in the previous two-year extension because the number of Plan participants increased by almost 45 percent (PAF ¶ 40). Hewitt reduced its compensation by approximately $130,000 per year, and agreed to provide "additional ongoing services" valued at more than $110,000 per year (DSOF ¶¶ 80-81, 84-86). When the Plan renegotiated the Hewitt

13

contract in 2002 to obtain these changes in the ASA, it did not use an independent consultant (PAF ¶ 46).

In July 2004, Ms. Youman retained Gildner to advise Kraft Benefits on upcoming contract negotiations with Hewitt (DSOF ¶ 87). Gildner compared Hewitt's fees to its trademarked database of recordkeeping agreements – a process referred to as "fee benchmarking" – and concluded that fees under the existing Hewitt ASA fell within the range of what could be expected from a competitive bid; thus, Gildner did not recommend that Kraft seek a competitive bid (*i.e.*, an RFP) unless it was unhappy with the services Hewitt had provided (DSOF ¶ 88). Kraft Benefits was satisfied with Hewitt's services and did not engage in an RFP process (DSOF ¶¶ 70-71). With Gildner's advice, Kraft sought a three-year term, additional services, and a $2.00 pppy increase which, due to the additional services, would decrease the overall fee per participant (DSOF ¶ 91). After negotiations, Kraft and Hewitt agreed to a seven-year contract, a $3.00 pppy increase (from $55.00 to $58.00), and a communications and education package at no additional cost (which Hewitt valued at $3.00 pppy) (DSOF ¶¶ 93-94; PAF ¶ 50). Hewitt further agreed to reduce the termination for convenience fee, and to raise the trigger point for excess phone call fees (DSOF ¶¶ 92, 96).

The fees for Hewitt's services are included within the fees listed in the fund fact sheets ("FFS"), which the Plan issues for each investment option. An FFS states the total annual operating expenses (administrative fees plus investment fees) for each investment fund as a percentage of fund assets (known as the "expense ratio") (DSOF ¶¶ 17-20). From October 2000 to October 2006, the expense ratio for the Altria Group Stock Fund ranged from 0.08 percent to 0.12 percent (DSOF ¶ 17). From November 1, 2001, to October 2006, the expense ratio for the Kraft Foods Stock Fund ranged from 0.08 percent to 0.22 percent (*id.*). Most of the remaining, multi-stock investment

14

options for participants during those years had expense ratios ranging from 0.08 percent to 0.32 percent (*id.*). The exceptions were the Growth Equity Fund, whose expense ratio ranged from 0.82 percent to 1.07 percent, and the Balanced Fund, whose expense ratio ranged from 0.46 percent to 0.67 percent (*id.*).

The Plan also issues information in "statement stuffers," which are mailed to participants with their quarterly account statements (DSOF ¶ 21; Youman Decl. ¶ 12). The statement stuffers disclose that "[n]early all of the expenses of administering the Kraft Thrift Plan and investing the Plan's assets, such as investment management fees, trustee fees, brokerage commissions, participant recordkeeping and legal fees, are paid from the Plan's assets. Any remaining Plan expenses are paid by Kraft Foods" (DSOF ¶ 21, Defs.' Ex. 21-E). Some of the statement stuffers include a comparison to the average fees of similar mutual funds, except for the CSFs, which do not use an active or index management fund (*id.*). The statement stuffers also remind participants that fee information is available in the FFS (DSOF ¶ 21).

On January 1, 2003, the SPD added the following information about fees: "In addition to investment risk, you may want to consider each fund's fees. The fund expenses and management fees for each of the funds may be charged against your investment returns or in another manner. The fees, in effect, may reduce your return" (Defs.' Ex. 21-H at 12). In October 2005, the SPD further disclosed to participants that: "In addition to investment risk, you may want to consider each investment fund's expense ratio, including investment management fees. The expenses for each of the investment funds are charged against the net asset value (NAV) of the specific investment fund and reduce your investment return. These fees are reported on the Fund Fact sheet for each investment fund" (Defs.' Ex. 21-I at 17). The SPDs state that if a participant wants additional

15

information, the participant may log on to the Thrift Plan website, review the FFS, or request a description of the "annual operating expenses of each of the investment funds, including investment management and administrative fees and transaction costs which reduce the rate of return and the aggregate amount of such expenses expressed as a percentage of the average net asset of each fund" (Defs.' Ex. 21-I at 41; Defs.' Ex. 21-F at 37).

In addition, in its IRS Form 5500 and summary annual report, the Plan annually discloses the amount it pays to Plan service providers (DSOF ¶¶ 25-26). The summary annual report for 2004 stated that Plan expenses were $284,708,000, which included $6,565,000 in administrative expenses and $278,143,000 in benefits paid to participants and beneficiaries (DSOF ¶¶ 25-26; Youman Decl., Ex. M, 2004 Summary Annual Report, ("Defs.' Ex. 21-M")). The Form 5500 for 2004 specified that Kraft paid $3,381,789 to Hewitt Associates as the Plan's recordkeeper (Youman Decl., Ex. L, 2004 Form 5500 ("Defs.' Ex. 21-L")).

## D.

Maintaining a 401(k) plan with the number of participants and investment fund alternatives as the Plan has requires the services of a trustee to hold, manage, and invest the Plan's funds. The Plan compensated its trustees – first Deutsche Bank and then State Street – with (1) a base fee, (2) per-item fees for services such as preparation of participant distribution checks, and (3) "float" (DSOF ¶ 121). "Float" is revenue earned from the short-term use or interest earned on plan assets in transit, such as checks for distribution or transfer issued by the Plan but not yet presented for payment or transfer (DSOF ¶¶ 114-116).

Since State Street became the Plan's Trustee in 2003, it has held the Plan's assets and has been compensated for services including custodial services, reporting, and making disbursements

16

to Plan service providers and Plan participants (DSOF ¶¶ 119-20). The fee schedule with State Street provides that the Plan will pay State Street a base fee as well as per-item fees, and that the interest earned on the State Street disbursement account is part of State Street's overall compensation (DSOF ¶ 121). On its invoices, State Street did not identify the amount of float, but it did disclose the circumstances under which float will be earned and retained, when the float period commences and ends, and the type of interest rate State Street used to value the float (DSOF ¶ 123). An alternative, higher fee schedule was available if State Street did not retain the float (*id.*).

## III.[4]

Under ERISA, plan fiduciaries must discharge their duties "solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . ." 29 U.S.C. § 1104(a)(1). Plaintiffs allege that defendants breached their fiduciary duty to Plan participants by mismanaging the CSFs, Hewitt's compensation, and the float retained by State Street, and by inadequately informing Plan participants on these matters. Specifically, plaintiffs contend that defendants: (1) maintained excessive cash in the Altria and Kraft Stock Funds, leading to excessive and unnecessary transaction costs and fees; (2) paid unreasonable and excessive fees to Hewitt, the Plan's recordkeeper, and failed to adequately monitor these fees; (3) failed to monitor or account for float, leading to payment of excessive fees and

---

[4]Defendants' summary judgment memorandum is cited as "Defs.' Mem." (doc. #224); plaintiffs' memorandum in opposition is cited as "Pls.' Mem." (doc. # 237); and defendants' reply memorandum is cited as "Defs.' Reply" (doc. # 240).

17

expenses to State Street; and (4) failed to make ERISA-required disclosures regarding Plan fees and expenses to participants (Jt. Stmt. at 2-3).[5]

To prevail on a breach of fiduciary duty claim under ERISA, plaintiffs must prove: "(1) that defendants are plan fiduciaries; (2) that defendants breached their fiduciary duties; and (3) that their breach caused harm to the plaintiffs." *Kannapien v. Quaker Oats Co.*, 507 F.3d 629, 639 (7th Cir. 2007). ERISA provides a "safe harbor" from liability for fiduciaries where an investment loss results from a participant's own actions in controlling their investments in the plan. 29 U.S.C. § 1104(c)(1).

## A.

Defendants challenge each of plaintiffs' assertions of breach. We begin by addressing an argument that defendants saved for last in their briefing: that there can be no liability because no defendant was a Plan fiduciary. Defendants argue generally that Kraft, KFAC, and BIC – and by extension, the individual members of BIC – had no fiduciary responsibility over at least some of the matters at issue in this case, and thus the Court should dismiss those claims against them (Defs.' Mem. at 24-25).

---

[5]On March 19, 2009, pursuant to the Court's order (doc. #211), the parties filed a Joint Statement of the Claims which clarified and condensed the allegations in plaintiffs' complaint (doc. #215, Jt. Stmt.). In the Joint Statement, plaintiffs indicated that they wished to present additional claims that defendants breached their fiduciary duty under ERISA by failing to implement a securities lending program, by failing to inform themselves of trends, developments, practices and policies, and by violating ERISA § 406 for failing to monitor and account for the float (Jt. Stmt. at 2-3). The Court agreed with defendants, however, that these arguments were outside the scope of the Complaint and thus not properly in the case (doc. #216: 4/1/09 Min. Entry). Furthermore, the Court declined to allow defendants to argue that plaintiffs' stock funds claim be limited to the period ending in 2007 (*id.*).

In the Joint Statement, the parties agree that the complaint alleges a claim that defendants breached their fiduciary duties by paying excessive management fees on two Funds other than the CSFs: the Growth Equity and Balanced Funds (Jt. Stmt. at 2). However, plaintiffs further stated that they would not offer evidence on that claim at trial (Jt. Stmt. at 3 n.2). As plaintiffs cannot prevail at trial on a claim for which they offer no evidence, we grant defendants summary judgment on that claim.

18

For liability to attach, defendants must have been acting in their capacity as Plan fiduciaries when they participated in the actions that are the subject of the Complaint. *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 472 (7th Cir. 2007). The Seventh Circuit applies a "liberal standard for fiduciary status." *Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004). A person is a fiduciary with respect to an ERISA plan, to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets; (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A).[6] A fiduciary may be named in the plan document or designated to carry out fiduciary responsibilities by the named fiduciaries. 29 U.S.C. § 1105(c)(1)(A-B). Where a person or entity is not named as a fiduciary in the ERISA plan documents, the Court looks at whether the parties at issue were "functional" fiduciaries; that is, whether they exercised *de facto* discretionary control or authority over the management of the plan, the disposition of the plan's assets, or the administration of the plan. *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009). A person who performs purely clerical functions relating to the administration of the Plan, with no

---

[6]Defendants argue in a footnote – with a citation only to an unpublished Middle District of North Carolina case – that an "entity" may not constitute a "person" under the ERISA definition of fiduciary (Defs.' Mem. at 24 n.14). That argument is a nonstarter. The Seventh Circuit has explicitly held that "a claim for breach of fiduciary duty lies only against an individual *or entity* that qualifies as an ERISA fiduciary." *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 547 (7th Cir. 1997) (emphasis added). Other courts of appeal also assume that an ERISA fiduciary may be either a "person" or an "entity." *See, e.g., Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006); *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 64-65 (2d Cir. 2006); *In re Luna*, 406 F.3d 1192, 1208 (10th Cir. 2005); *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot*, 354 F.3d 348, 353 n.13 (5th Cir. 2003); *ITPE Pension Fund v. Hall*, 334 F.3d 1011, 1015 (11th Cir. 2003).

discretionary authority or control in the tasks she was assigned, is not an ERISA fiduciary. *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 547 (7th Cir. 1997).

In general, if the responsibility of a named fiduciary has been allocated to another person, the named fiduciary will not be liable for any act or omission of that person in carrying out the designated responsibility. 29 U.S.C. § 1105(c)(2). However, a named fiduciary's power to appoint and remove people may, in some circumstances, create a fiduciary duty to monitor their actions. *Baker*, 387 F.3d at 663-64. In *Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984), for example, the Seventh Circuit held that although the defendants did not need to examine every action taken by the administrators, they "were obliged to take prudent and reasonable action to determine whether the administrators were fulfilling their fiduciary obligations" – *i.e.*, monitor the administrators – because of the defendants' close relationship with, and control over them. *Leigh*, 727 F.2d at 134-35 n.33; *see also Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 736 (7th Cir. 1986) (holding that, as in *Leigh*, the named corporate parties "may well have [had] some duty to monitor the actions of the plan administrator and the insurance company administering the Plan" because they may have been fiduciaries for some purposes by virtue of their power to amend and select a new administrator for the plan).

Here, each entity was a named fiduciary in the Plan document, and the individual defendant members of BIC acknowledged their fiduciary status to the Plan and its participants in writing. Thus, the question is whether they were fiduciaries as to the matters at issue in this case during the relevant time frame. At all relevant times, KFAC had the authority and discretion, first as the delegatee of authority from MCEB and later as a specifically named fiduciary, with respect to the non-investment operations and administration of the Plan. In addition, Kraft retained its fiduciary

20

responsibilities as to the non-investment operations of the Plan because the MCEB and KFAC were composed of Kraft officers and directors, and Kraft retained the authority to appoint and remove them. *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 414 (4th Cir. 2007) (holding that the employer had fiduciary responsibility over the investment operations of the plan even when it delegated investment decision-making authority to an investment committee, because the committee was composed of high-ranking company officers which reported to the board of directors). Because of its power to appoint, remove, and amend, Kraft retained the obligation "to take prudent and reasonable action to determine whether the administrators were fulfilling their fiduciary obligations." *Leigh*, 727 F.2d at 135. Thus, both Kraft and KFAC had fiduciary responsibilities as to the non-investment operations of the Plan, which included disclosures to participants and the retention of service providers, such as recordkeepers.

As to the Plan's investment operations, there can be no dispute that BIC was a Plan fiduciary since its creation in January 2004, when the Plan vested discretionary authority in its investment operations in BIC. However, neither BIC nor its members can be held liable for events that took place before BIC was created, and individual members of BIC cannot be held liable as fiduciaries for periods outside the times they served on BIC, unless they were aware of prior breaches of fiduciary duty by their predecessors and failed to remedy them. *See* 29 U.S.C. §§ 1109(b), 1105(a)(3); *see also Jenkins v. Yager*, 444 F.3d 916, 925 (7th Cir. 2006).

As with the non-investment operations, Kraft maintained fiduciary responsibility over the investment operations of the Plan. Between 2001 and January 2004, the Compensation and Governance Committee of the Board of Directors of Kraft was the "investment committee" referred to in the Plan, and since 2004, BIC had this responsibility. The close relationship between the named

21

fiduciaries and those who had been delegated responsibilities – all officers or directors at Kraft – as well as Kraft's power to appoint and remove, establishes Kraft's fiduciary responsibility over investment operations of the Plan. *See Leigh*, 727 F.2d at 135.

BIC, however, had no fiduciary responsibility for non-investment operations of the Plan, such as setting Hewitt's compensation. Conversely, KFAC never possessed nor exercised authority over the relevant investment portions of the Plan's operation: the CSFs and State Street's retention of float. Prior to 2001, when the Corporate Employee Plans Investment Committee of Philip Morris Companies was the Plan's investment committee, plaintiffs provide no facts as to why any defendants besides Kraft would have had fiduciary responsibility as to the investment operations of the Plan.

## B.

Having found that certain defendants were fiduciaries of the Plan with respect to each of the actions alleged in plaintiffs' complaint, the Court now considers plaintiffs' specific allegations of breach. As explained above, under ERISA, plan fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . ." 29 U.S.C. § 1104(a)(1)(B). When deciding whether a plan fiduciary has acted prudently, a court must ask whether the fiduciaries employed a "reasoned decisionmaking process" at the time they engaged in the challenged transactions. *DiFelice*, 497 F.3d at 420. Although the Supreme Court has not yet determined whether review of an ERISA fiduciary's decision outside the benefits context is deferential or plenary, the Seventh Circuit has established that prudence "involves a balancing of competing interests under conditions of uncertainty." *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728,

22

732-33 (7th Cir. 2006) (reversing district court's grant of summary judgment in favor of trustee where fact issues remained as to whether trustee imprudently ignored changed circumstances that increased the risk of loss to the employer stock plan participants).

The prudent person standard does not require the fiduciary to take any particular course of action, even if one course later may seem to have been preferable to another. *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006). "The test is how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (internal quotations omitted).

We address in turn plaintiffs' claims that defendants breached their fiduciary duties in connection with the maintenance of the unitized CSFs, the recordkeeping fees paid to Hewitt, and the fees paid to State Street. The Court will address plaintiffs' fourth claim – that defendants breached their fiduciary duties by failing to make ERISA-required disclosures – within the discussion of the other claims of breach.

**1.**

Plaintiffs allege that defendants – at least those with a fiduciary responsibility for investment operations in the Plan – breached their fiduciary duty by imprudently maintaining the CSFs offered by the Plan and failing to disclose the negative effects of the cash buffer to participants (PAF ¶¶ 6-8, 10). Plaintiffs argue that the unitized structure of the CSFs was inherently imprudent.[7] Plaintiffs

---

[7] While plaintiffs profess to argue only that the "amount" of the cash buffer was excessive, their expert Ross Miller focuses on the problems associated with the existence, *vel non*, of a cash buffer in the unitized funds. That said, since plaintiffs agree that maintaining a unitized stock fund is permissible under ERISA, it is not for the Court to say that a unitized stock fund is impermissible *per se*. *Cf. Armstrong*, 446 F.3d at 732 (holding that although employee stock ownership plans may be inherently risky because they invest in only one stock, such funds are permissible). In fact, Congress has followed a strong policy in favor of encouraging employee investment in employer stock. *DiFelice*, 497 F.3d at 425.

also say that the CSFs were mismanaged because trading costs – such as brokerage and trading fees – were borne by the CSFs as a whole rather than the individual making the trades, and the Plan did not limit the number or frequency of trades participants could make. This decreased participants' returns – or, at least, the returns of those participants who did not frequently make trades (DSOF ¶ 42; PAF ¶ 10).

As explained above, each investor in a unitized fund owns "units" rather than shares of the fund. The units in the Plan's CSFs consist of a portion of the company's common stock and the cash buffer. Plaintiffs contend that the unitized nature of the CSFs reduced participants' returns: the CSFs' value increased less than the value of the underlying common stock due to the cash buffer, because the cash held in the CSF did not appreciate as much as the stock. Plaintiffs refer to that alleged loss as "investment drag" (PAF ¶¶ 6-8). Plaintiffs' expert Ross Miller concluded that the Plan lost $83.7 million through August 31, 2007, due to investment drag, by calculating the total monthly returns of the Altria and Kraft common stock and subtracting the total monthly returns of the Altria and Kraft CSFs (PAF ¶¶ 12, 26; Defs.' Ex. 29, Miller Dep., Ex. A., Miller Report ("Defs.' Ex. 29-A") at 19-23). Based on these calculations, Mr. Miller calculated $80,218,412.00 in cumulative damages in the Altria CSF and $3,529,489.00 in cumulative damages in the Kraft CSF (Defs.' Ex. 29-A at 19-23).

Defendants argue that their decision to maintain unitized funds was prudent because there are several positive aspects of unitized funds that plaintiffs ignore. For example, the cash buffer enables the CSFs to release funds for a participant to transfer to another investment option the same day, without the need to buy or sell stocks, thus reducing the CSF's overall brokerage commissions (DSOF ¶¶ 45-47). Absent the cash buffer, the trustee would have to sell stock to meet a net outflow

24

of investment from a CSF or purchase stock if there was a net inflow of investment (Defs.' Ex. 31, Niden Dep., Ex. A, Niden Report ("Defs.' Ex. 31-A") at 3-5). This "real-time trading" requires participants to pay for purchases immediately, then wait three days before the sale proceeds are available for redeployment (Defs.' Ex. 31-A at 5). This results in potential costs because participants waiting on the sale proceeds will lose out on some opportunities to reinvest the proceeds favorably (*id.* at 5-6). Defendants' expert Cathy Niden further notes that unitized funds avoid additional complexities of real-time trading, such as variable timing restrictions and transaction prices (*id.* at 6).

Moreover, holding a certain amount of cash in the stock funds also can act as a hedge against possible decline in stock value. While the assets in the CSFs earned less returns than the underlying common stocks when the value of the common stock increased than it would had there been no cash holdings (Defs.' Ex. 29-A at 4), the converse is also true: if the value of the common stock drops, the value of the unitized fund will not drop as much. As Ms. Niden explains, the cash in the unitized funds dampens their relative volatility, so that the calculation of the investment drag varies widely depending on the end date upon which it is calculated and the value of the underlying stocks at that time (Defs.' Ex. 31-A at 14-15). *See Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1119 (C.D. Cal. 2009) (crediting expert's opinion that a unitized stock fund may outperform the value of the company stock if the value of the stock is on the decline or increasing at a slower rate than the fund).

Furthermore, defendants argue that their decision was prudent because unitized funds are "standard" in the industry, and the fees and expenses incurred by the CSF participants in the Plan are similar to those incurred by other unitized funds. More than half of the 401(k) plans that have employer stock funds use a unitized structure, and at least 24 percent of Dow Jones Industrial

25

Average companies, like Kraft, maintain unitized stock funds (DSOF ¶ 44), (Pls.' Mem. at 9 n.8).[8]
Further, Ms. Niden cites evidence that it is common for CSFs to be offered as unitized funds, with
cash reserves ranging from three to five percent as the Plan's CSFs did (DSOF ¶ 62; Defs.' Ex. 31-A
at 7).

Plaintiffs' argument that industry practice is "entirely irrelevant" (Pls.' Mem. at 10) is
contrary to the standard set forth under ERISA, which assesses fiduciary duty by comparing a
defendant's actions with those of "a prudent man acting in a like capacity and familiar with such
matters . . ." 29 U.S.C. § 1104(a)(1)(B). While a plaintiff may demonstrate that industry should
have done more under certain conditions, *Wilson v. Bradlees of New Eng. Inc.*, 96 F.3d 552, 557 (1st
Cir. 1996), plaintiffs here offer no evidence of any industry-wide conditions that undermine the
validity of unitized funds.

Indeed, courts have repeatedly rejected claims that maintaining unitized funds constituted a
breach of fiduciary duty. *See, e.g., Benitez v. Humana, Inc.*, No. 08-CV-211, 2009 WL 3166651,
at *3 (W.D. Ky. Sept. 30, 2009) (granting motion to dismiss ERISA breach of fiduciary duty
complaint where the plan included an option to invest in a unitized company stock fund which held
employer common stock and approximately two percent cash to meet the cash needs for the fund's
daily transactions); *Taylor v. United Techs. Corp.*, No. 3:06cv1494, 2009 WL 535779, at *9 (D.
Conn. Mar. 3, 2009) *aff'd*, 2009 WL 4255159 (2d Cir. Dec. 1, 2009) (granting motion to dismiss
ERISA breach of fiduciary duty claim because fiduciary's evaluation of merits of retaining cash in
unitized company stock fund satisfied the prudent person standard).

---

[8]Defendants' expert claimed unitized funds were even more widespread. He found that in a 2008 survey of 436
sponsors of defined contribution plans, 70 percent of plans with CSFs use unitized funds; a 2005 survey showed that 58
percent of plans used unitized funds (Defs.' Mem. at 8).

Nevertheless, plaintiffs contend that the amount of cash in the CSFs was not adequately monitored, and was limited only by the broad restriction that the cash buffer be kept solely for liquidity or administrative purposes. The restriction to keep cash for liquidity or administrative purposes, however, is not a limitless grant of authority to increase the amount of cash in the CSFs. Rather, the restriction means that the cash buffer must be calculated for the limited purpose of satisfying the fund's need for cash to accommodate participant requests for transfers, payments, and withdrawals in a timely manner. *See DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 735, 745-46 (E.D. Va. 2005), *Edgar v. Avaya*, No. 05-3598, 2006 WL 1084087, at *5 n.4 (D.N.J. Apr. 25, 2006); *In re Gen. Motors ERISA Litig.*, No. 05-71085, 2006 WL 897444, at *18-20 (E.D. Mich. Apr. 6, 2006). Defendants do not breach their fiduciary duty under ERISA in maintaining a unitized stock fund where they evaluate the pros and cons of maintaining the fund and "evaluate[] and monitor[] the amount of cash necessary to cover participant sales. . ." *Taylor*, 2009 WL 535779, at *9; *Tibble*, 639 F. Supp. 2d at 1119.[9]

Plaintiffs also argue that the Plan's CSFs were imprudent because defendants were aware of losses caused to participants by excessive day trading and had the power to limit these losses, but failed to do so. According to plaintiffs, participants in the Plan's CSFs are subjected to "transactional drag" from trading costs – such as brokerage commissions, SEC fees on stock sales, and implementation costs (the difference in the closing price granted on a transaction versus the actual execution in the next day's market) – that are allocated evenly across all participants

---

[9]In *Abbott v. Lockheed Martin Corp.*, No. 06 C 0701, 2009 WL 839099 (S.D. Ill. Mar. 31, 2009), by contrast, the court found a triable issue of fact as to whether the amount of cash held in the plan's unitized stock fund was prudent. In that case, however, there was evidence that the amount of cash held in the fund "actually exceeded the 10% ceiling" that was allowed under the plan. *Id.* at *12. Here, the amount of cash held did not exceed 5%, and there is no evidence that the Plan placed a ceiling on the amount of the cash buffer.

independent of their trading activity (Defs.' Ex. 29-A at 7). Thus, frequent traders bear only a fraction of the costs of their trades at the expense of infrequent traders, creating an incentive to trade excessively (*id.*; PAF ¶¶ 6-8).

Plaintiffs argue that defendants could have decreased or eliminated transactional drag by implementing a real-time trading product; establishing restrictions on the frequency of trading; charging a transaction fee for each trade; or otherwise establishing a trading cost allocation system (Pls.' Mem. at 9; PAF ¶¶ 16-23). Plaintiffs point to the fact that in 2003, Altria instituted a real-time trading procedure with its recordkeeper that levied charges from trades on the individual traders rather than spread them equally among all participants (Pls.' Mem. at 9; PAF ¶¶ 11-15). Although Kraft's recordkeeper – unlike Altria's recordkeeper – did not offer real-time trading, Hewitt indicated that it may have been able to implement real-time trading if Kraft required it (Pls.' Mem. at 9; PAF ¶¶ 11-15).[10]

Emails were exchanged between Kraft officers and directors, some of whom had been delegated fiduciary authority on investment matters, regarding the problems associated with transactional drag and potential solutions. For example, on October 15, 2002, Sandra Hind, manager of ALCS Benefit Investments (which had administrative oversight of the Master Trust), sent a memorandum to Altria's corporate treasurer, Amy Engel, stating that the impact of transactional drag in the Plan's Altria Stock Fund was "significant," because in 2001 the Altria Stock Fund incurred $3.6 million of transactional drag due to transfer activity (PAF ¶ 12). Ms. Hind suggested moving

---

[10]Plaintiffs imply that they may again seek to add Altria as a defendant in this case: they allege in a footnote that Altria, through delegations of authority from Kraft and service agreements with Kraft, provided administrative and investment oversight for both the Altria Plan and Kraft Plan (Pls.' Mem. at 7 n.6.) This allegation, however, does not establish a genuine issue of material fact as to Altria's fiduciary responsibility over the Kraft CSFs, and thus does not change the Court's earlier ruling that plaintiffs may not add Altria to their Complaint.

to "an alternative administration of the [CSFs] that can directly link all transaction costs solely to those participants who initiate a transaction" (PAF ¶ 13). On January 2, 2003, Mr. Werner sent Jill Youman (Vice President of Human Resources at Kraft), Mike Wright, Joanne Armenio (Director of International Benefits and KFAC member), Martha Pechnyo (Senior Director U.S. Benefits and KFAC member), and Ms. Hind an email stating the costs of transactional drag in the Altria Stock Fund as more than $100.00 per participant (PAF ¶ 13). Concerns that alternatives to a unitized stock fund may need to be enacted to minimize the cost of frequent trades to non-trading participants were further shared in emails dated January 29, 2003, July 25, 2003, and October 2003, between the aforementioned individuals and Paul Halaburt of Hewitt, Scott Speidel, Stacey Waskey, Kelli Christenson, and Theodore Banks (PAF ¶¶ 15-16).

Ultimately, defendants determined that the advantages of maintaining the structure of the CSFs outweighed the benefits of changing to a real-time trading system. The existing structure allowed Plan participants to complete trades faster, facilitated quick reinvestment of money withdrawn from the CSFs, and reduced brokerage costs by eliminating the need for many open market transactions (Defs.' Reply at 6; Defs.' Mem. at 9). Defendants argue that these emails demonstrate that they exercised prudence in administering the CSFs, utilizing a reasoned decision-making process that "balanc[ed] [ ] competing interests under conditions of uncertainty." *See Armstrong*, 446 F.3d at 733.

We agree. A fiduciary often must balance competing interests when arriving at a decision. *Armstrong*, 446 F.3d at 732-33. Often, no one decision will simultaneously advance all goals. That is why the requirement that a fiduciary act prudently mandates that he or she use a "reasoned decision-making" process, *DeFelice*, 497 F.3d at 420, and not that the choice resulting from that

29

process be one that all will agree was the optimal one. In this case, the undisputed material facts persuade the Court that no triable issue is raised as to whether defendants acted prudently in structuring the CSFs, despite the resulting transactional drag.

Plaintiffs next contend that even if defendants utilized prudence in managing the CSFs, they breached their fiduciary duty by failing to disclose – and in some cases, actively concealing – the performance of the CSFs relative to the underlying stock. Specifically, plaintiffs allege that defendants failed to disclose that the CSFs were "mismanaged" and contained varying amounts of cash due to trading activity, and that the Plan suffered millions of dollars in losses as a result (Pls.' Mem. at 11-12, 20). In this case, the SPDs stated that the value of the accounts invested in the CSFs "closely tracks the daily changes in the price of the underlying stock," except that "[t]he cash reserve, income earned on the cash, and other trust activities generally account for small differences in the rate of return" (Defs.' Ex. 29-A at 13). Mr. Miller contends that this disclosure was misleading because over the course of years, the "small differences" could amount to a difference of 10 percent or more (*id.*). Moreover, Mr. Miller notes that the Plan did not compare the CSFs to a benchmark fund – such as the value of the common stock – in the quarterly fact sheets even though defendants used the underlying stock performances as a benchmark internally (Defs. Ex. 29-A at 14-15).

Plaintiffs do not contend that defendants failed to comply with the disclosure requirements set forth in the ERISA statute, and Plan fiduciaries do not have a duty to disclose more information than ERISA's notice provisions require. *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 808 (7th Cir. 2009). We recognize that a plan fiduciary will be found liable for breach of fiduciary duty under ERISA for failure to disclose if the fiduciary made an intentionally misleading statement or a material omission. *Hecker*, 556 F.3d at 585. But, the evidence here does not present a genuine

30

issue of material fact that defendants had such an intent. The performance of the unitized stock funds does not lend itself to an "apples to apples" benchmark comparison with the value of the common stock because the common stock will never have a cash component (Defs.' Ex. 31-A at 13-14). Further, the details of the CSFs were adequately disclosed to participants. Participants were informed that the CSFs consisted of a combination of company stock and a cash buffer for liquidity or administrative purposes only. In addition, the quarterly FFS disclosed the percentage of total assets invested in cash and/or cash equivalents, the percentage invested in the underlying stock, and the CSF's operating expenses as a percentage of fund assets (the "expense ratio") (Defs.' Ex. 31-A at 9, 16; Defs.' Ex. 21-D). The FFS also gave the return performance of the CSFs during the preceding three months, one year, three years (annualized) and five years (annualized), as well as the cumulative return over the past three and five years (*id.*). Information on the performance of Altria and Kraft common stock was publicly available, and participants were reminded that CSFs were the most risky investment of the fund choices because they were not diversified. *See DiFelice*, 497 F.3d at 420-21 (no breach was found where Plan participants were informed that the CSFs carried the highest risk of the available options).

ERISA's fiduciary duty of care "requires prudence, not prescience," *Keach v. U.S. Trust Co.*, 419 F.3d 626, 638 (7th Cir. 2005), and "investment losses are not proof that an investor violated his duty of care" *Jenkins*, 444 F.3d at 926. Here, the undisputed facts show that defendants used a reasoned decision-making process to determine the structure of the Plan's company stock funds and to maintain an adequate amount of cash to meet the demands of trading in the funds, and defendants disclosed adequate details of these facts to the participants in the CSFs. There is no triable issue on

31

the claim that defendants breached their fiduciary duty with respect to the maintenance of a unitized CSF or disclosures about it.

Furthermore, at all times during the relevant period, participants in the Plan had the opportunity to invest in at least seven other investment funds if they felt that the CSFs were too risky or the expenses associated with them were too high. In the absence of evidence that these alternatives were unsound or reckless, the provision of a large number of investment alternatives, with disclosures allowing participants to make an informed decision as to their investment choices, would preclude a finding that defendants breached their fiduciary duties. *Hecker*, 556 F.3d at 590; *Hecker v. Deere*, 569 F.3d 708, 711 (7th Cir. 2009) (order denying rehearing *en banc*).

**2.**

Plaintiffs next contend that defendants breached their fiduciary duties under ERISA by causing the Plan to pay excessive recordkeeping fees to Hewitt and failing to adequately monitor these payments or disclose them to participants (Jt. Stmt. at 2). Plaintiffs argue that by failing to engage in a competitive request for proposal ("RFP") each time defendants renegotiated the Hewitt contract, they did not engage in a prudent process to determine recordkeeping fees. Plaintiffs claim that defendants thus caused the Plan to pay $28 million in excessive recordkeeping fees (Pls.' Mem. at 13; PAF ¶¶ 54-57). For their part, defendants say that the Plan fiduciaries engaged in a prudent process to negotiate fees, and that the resulting fees were reasonable given that the fiduciaries were pleased with Hewitt's performance (Defs.' Mem. at 11).

To determine whether defendants prudently discharged their duties in connection with the fees paid to Hewitt, the Court considers whether, at the time they engaged in the challenged transactions, they employed a "reasoned decisionmaking process," utilizing appropriate methods to

32

investigate the reasonableness of the recordkeeping fees charged by Hewitt. *DiFelice*, 497 F.3d at 420. The appropriate methods will be those used by a prudent investor under similar circumstances. *Hecker*, 556 F.3d at 586. ERISA does not require fiduciaries "to scour the market" to find the "cheapest possible" fund or service provider. *Id.*

Although plaintiffs claim that defendants inadequately monitored Hewitt's fees, the undisputed facts show that Kraft fiduciaries regularly reviewed their contract with Hewitt. Kraft first retained Hewitt as recordkeeper in the second quarter of 1995, after retaining Buck to conduct an RFP from Hewitt and Bankers Trust (Youman Decl., Ex. Q, Buck Opinion). In 1998, Hewitt's fees were reduced after negotiations between Kraft and Hewitt (DSOF ¶ 64). In 2000, Kraft hired Buck again to review a proposed ASA with Hewitt (DSOF ¶ 65). Although Buck's suggestions were only partially implemented, Buck opined that the fees in Hewitt's ASA appeared consistent with the standards of the industry and similar vendors (DSOF ¶ 69). In 2001, Kraft's parent company, Philip Morris, retained Gildner to conduct an RFP for a new recordkeeper for its 401(k) plan and for the Kraft Plan. Philip Morris ended up choosing Fidelity, while the Plan kept Hewitt as its recordkeeper (DSOF ¶¶ 74-79). On June 6, 2001, Kraft and Hewitt entered into a two-year extension of their 2000 ASA to December 31, 2005, which included a $1.00 pppy fee reduction effective August 2003 and a further $1.00 pppy fee reduction effective August 2004 (DSOF ¶ 73; Youman Decl., Ex. T, 8/1/00 ASA; Youman Decl., Ex. W, 1/7/02 Hewitt RFP; Youman Decl., Ex. Z, 1/1/03 ASA).

In 2002, after MCEB approved the merger of two Nabisco plans into the Plan, Kraft again renegotiated the ASA with Hewitt, and Hewitt reduced its compensation and agreed to provide additional services for the Plan (PAF ¶ 40; DSOF ¶¶ 80-81, 84-86). In 2004, the Plan hired Gildner to assist in negotiations for an ASA with Hewitt (DSOF ¶ 87). Gildner reviewed the 2003 ASA and

33

found it to be reasonable using Gildner's benchmarking database (DSOF ¶ 88). Although not all of Gildner's recommendations were incorporated into the final agreement, the 2006 ASA did include a reduction in fees, a provision for insurance coverage, and transition services language (DSOF ¶¶ 93-94; PAF ¶ 50).

Despite the numerous renegotiations of the Plan's ASA with Hewitt, plaintiffs maintain that the decision to retain Hewitt as recordkeeper was imprudent because Hewitt's fees were excessI've and the methods used to evaluate Hewitt's fees were inadequate. Plaintiffs' expert Lawrence Johnson, a consultant for mid-sized 401(k) plans, opined that not only was Hewitt's base fee excessive, but the inclusion of early termination fees and additional service fees in the ASA were imprudent and should have been eliminated (Defs.' Ex. 28, Johnson Dep. at 56-57; Defs.' Ex. 28-A, Johnson Report at 12-13). Looking at the base fees he charges his own clients for recordkeeping, Mr. Johnson opined that a reasonable cost per participant for administrative fees should have been between $20.00 and $27.00, compared with the $43.00 to $65.00 range charged by Hewitt between 1995 and 2007 (Defs.' Ex. 28-A at 20-21). Further, plaintiffs contend that the only prudent way to measure the reasonableness of a recordkeeper's fees is to conduct an RFP, and thus, that the Plan's research into the reasonableness of Hewitt's fees was insufficient because RFPs were not conducted every time the ASA was renegotiated (Defs.' Ex. 28-A at 17).

Defendants' expert Jennifer Flodin, another retirement plan consultant, disagrees. She opined that based on her experience, charging additional service fees for acquisition and divestiture activity performed by the recordkeeper is reasonable and common in the industry (Defs.' Ex. 26, Flodin Dep., Ex. B, 12/22/08 Flodin Report ("Defs.' Ex. 26-B") at 13-14). Furthermore, Ms. Flodin

34

notes that the early termination fee provisions in the ASA were never triggered (Defs.' Ex. 26-B at 13).

Moreover, Ms. Flodin contends that in addition to RFPs, there are several different methods for determining the reasonableness of fees, and based on these methods, she concluded that Hewitt's fees were reasonable and standard in the industry (Defs.' Ex. 26-B at 8-10). Defendants utilized these other methods to select their recordkeeper, including "benchmarking using industry survey data, retaining an independent third party to benchmark recordkeeping fees, [and] retaining an independent third party to review service provider contracts" (Defs.' Mem. at 14). Defendants retained Buck and Gildner at various times to evaluate the reasonableness of the contract with Hewitt, and each time, these independent consulting firms concluded that Kraft's ASAs with Hewitt were reasonable provided that Kraft was satisfied with Hewitt's services – which Kraft was (Defs.' Mem. at 12; DSOF ¶¶ 70-71). Indeed, Buck generally recommends that their clients conduct RFPs for other recordkeepers only if they are dissatisfied with their current recordkeeper or if Buck's analysis suggests that the proposed fees are not competitive (DSOF ¶ 68).

Moreover, Gildner used a benchmarking database to compare the fees charged by Hewitt with fees charged by other recordkeepers, and Gildner found Hewitt's fees to be reasonable. Like Gildner, Ms. Flodin's retirement plan consulting firm has its own benchmarking database. Ms. Flodin compared Hewitt's fees to the proprietary data regarding recordkeeping fees her firm maintains based on their experience in the industry – a comparison of 19 different vendor bids for plans with similar numbers of participants and assets (DSOF ¶¶ 102-05). Based on her firm's database, Ms. Flodin determined that Hewitt's per participant fee was within a reasonable

35

recordkeeping fee range for similarly sized plans for each year from 2000 to 2007 (Defs.' Ex. 26-B at 1, 8).

Plaintiffs suggest that Kraft never fully considered whether other recordkeepers were more reasonable because Kraft never intended to leave Hewitt (Defs.' Ex. 28-A at 10-11). Plaintiffs point to the fact that when Philip Morris conducted an RFP which included bids from Hewitt, Philip Morris went with a different recordkeeper while Kraft stayed with Hewitt (*id.*; DSOF ¶¶ 78-79). Defendants respond that they required different services than Philip Morris, which services Hewitt provided to their satisfaction (DSOF ¶¶ 70-71). Indeed, Gildner opined that there was "no compelling reason" for the Plan to change its recordkeeper in 2001 (DSOF ¶ 78). Based on the number of times they reviewed and renegotiated their contract with Hewitt and their utilization of various standard industry methods to determine the reasonableness of Hewitt's fees, the Court finds that there is no triable issue as to whether defendants used a reasonable decision-making process in making their contracts with Hewitt.

We have considered plaintiffs' criticisms of the retention of Hewitt, and conclude that they do not create a triable issue. Mr. Johnson's opinion concerning the reasonable cost for Hewitt's services is of limited relevance, for two reasons. *First*, Mr. Johnson's opinion is based on his experience with mid-sized companies, and we are not persuaded that this experience translates to the reasonableness of fees for large companies such as Kraft. *Second*, Mr. Johnson's opinion is contrary to the information that defendants received from Buck and Gildner, each of whom told defendants that Hewitt's fees were reasonable. Plaintiffs offer no reason why, at the time defendants made their decision, it was imprudent of them to rely on these assessments by Buck and Gildner.

36

The prudence of a fiduciary is measured at the time of action, and not in hindsight. *Bunch*, 555 F.3d at 7.

We also find no support for plaintiffs' contention that an RFP is the exclusive legitimate means of determining the reasonableness of a recordkeeper's fees. Plaintiffs cite no case law that so holds. In any event, we note that Hewitt first was selected in 1995 through an RFP process. There is no evidence that Buck recommended an RFP process in 2000, and the evidence shows that Gildner did not recommend one in 2004. To the contrary, both Buck and Gildner told defendants that Hewitt's fees were reasonable if Kraft was satisfied with Hewitt's service. Plaintiffs offer no evidence that Buck and Gildner were not reputable companies, or that it was imprudent at the time for defendants to accept their assessment of the reasonableness of Hewitt's fees.

Furthermore, contrary to plaintiffs' arguments, participants in the Plan were adequately informed of the recordkeeping fees the Plan paid. The quarterly FFS informed participants of the total annual operating expenses – of which recordkeeping fees were one part – of each investment fund as a percentage of fund assets (DSOF ¶¶ 17-20). Ms. Flodin opines that Kraft's disclosure of this expense ratio "follows current industry customs and practices" (Defs.' Ex. 26-B at 9). Mr. Johnson disagrees, arguing that "fee disclosure must be expressed to the participants in dollar amounts deducted from their accounts" and broken out between administrative and investment fees (Defs.' Ex. 28-A at 20).

The Seventh Circuit recently held that fiduciaries provided adequate disclosure of administrative fees charged to a retirement plan where they disclosed to participants the total fees for the funds and directed the participants to the fund prospectuses for information about management expenses as a percentage of fund assets. *Hecker*, 556 F.3d at 586. In *Hecker*, the

37

plaintiffs alleged that the defendants violated their fiduciary duty by not disclosing that the trustee was compensated through a revenue sharing arrangement, rather than directly. *Id.* at 578. The Seventh Circuit held that there was no breach because the fiduciaries disclosed the total fees for the funds, and that "is the critical figure for someone interested in the cost of including a certain investment in their portfolio and the net value of that investment." *Id.* at 586. We find that analysis fully applicable here, and that it undermines plaintiffs' argument.

In addition to the expense ratio, the quarterly account statements disclose that most of the Plan's administrative expenses, "such as investment management fees, trustee fees, brokerage commissions, participant recordkeeping and legal fees," are paid from the Plan's assets (DSOF ¶ 21; Defs.' Ex. 21-E). Some of the statements also display a comparison to the average fees of similar mutual funds (*id.*). Furthermore, the statement stuffers reminded participants that fees are charged to the Plan and that fee information is available in the FFS (DSOF ¶ 21). Occasionally the statement stuffers specified the fees charged for each investment option (*id.*).

Other information was disclosed to participants as well. The SPDs disclosed that participants may want to consider each investment fund's expenses or expense ratio and management fees for each of the funds because these expenses are charged against the net asset value of the investment fund and thus reduce participants' investment returns (Defs.' Ex. 21-H at 12; Defs.' Ex. 21-I at 17). The SPDs further noted that these fees are reported on the FFS for each investment fund, and that for additional information, participants may log on to the Thrift Plan website or request a description of the "annual operating expenses of each of the investment funds, including investment management and administrative fees and transaction costs which reduce the rate of return and the aggregate amount of such expenses expressed as a percentage of the average net asset of each fund"

38

(Defs.' Ex. 21-I at 41; Defs.' Ex. 21-F at 37). In addition, Kraft's SEC filings specified the total dollar amount of the recordkeeping fees; for example, Kraft's Form 5500 for 2004 stated that Kraft paid $3,381,789 to Hewitt Associates as the Plan's recordkeeper (DSOF ¶¶ 25-26; Defs.' Ex. 21-L; Defs.' Ex. 21-M).

We conclude that the undisputed material facts show that defendants did not breach their fiduciary duty under ERISA in negotiating and monitoring the Plan's recordkeeping fees, or in disclosing required information to participants.[11]

### 3.

Plaintiffs argue that defendants breached their fiduciary duties by failing to monitor "float," and by allowing State Street, the Plan's trustee, to retain the float (Jt. Stmt. at 2). Float is sometimes treated as part of a bank's compensation for providing trust services to a plan (DSOF ¶ 116). Since State Street became the Plan's Trustee in 2003, it has held the Plan's assets and been compensated for services including custodial services, reporting, and making disbursements to Plan service providers and Plan participants (DSOF ¶¶ 119-20). The fee schedule provides that the Plan will pay State Street a base fee as well as per-item fees for services such as preparation of participant distribution checks. The fee schedule also discloses that the interest earned on the State Street

---

[11]Furthermore, the Seventh Circuit has recently demonstrated its reluctance to find that fees – no matter how high – can breach a fiduciary's duty of care where they have been fully disclosed. In *Jones v. Harris Associates*, the Seventh Circuit held that Harris Associates, a mutual funds investment adviser, did not breach its fiduciary duty to mutual fund share owners under Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a - 35(b), because "[a] fiduciary must make full disclosure and play no tricks but is not a subject to a cap on compensation." 527 F.3d 627, 632 (7th Cir. 2008). The Court held that the fiduciary's fees need not be "reasonable" so long as there was "candor in negotiation, and honesty in performance," because competitive processes are superior to a "just price system." *Id.* at 632-33. In *Jones*, however, the investment adviser's salary was normal among similar institutions, and thus "no court" would question the reasonableness of those fees. *Id.*; *Cf. Jones v. Harris Assocs.*, 537 F.3d 728, 732 (7th Cir. 2008) (Posner, J., dissenting from denial of rehearing *en banc*) (arguing that unreasonable compensation can be evidence of a breach of fiduciary duty because the mutual fund governance structure enables investment advisers to charge exorbitant fees industry-wide).

39

disbursement account (the account State Street maintains to cover checks allocated to or disbursed from the Plan) – *i.e.*, float – is part of State Street's overall compensation (DSOF ¶ 121). On its invoices, State Street did not list the amount of float, but did disclose the circumstances under which float will be earned and retained, when the float period commences and ends, the type of interest rate State Street used to value the float, and that an alternative, higher fee schedule is available under which State Street does not retain the float (DSOF ¶ 123).

Plaintiffs' expert David Witz argues that defendants did not adequately monitor, approve, or disclose float as part of State Street's compensation (Defs.' Ex. 32, Witz Dep., Ex. A, Witz Report ("Defs.' Ex. 32-A") at 14-15). The Department of Labor ("DOL") Field Assistance Bulletin ("FAB") for 2002-2003 states: "Float should be regarded by plan fiduciaries and service providers as part of the service provider's compensation for services to the plan. As such, the plan fiduciary must have an adequate understanding of how the service provider will earn float, and how it contributes to the service provider's compensation. The service provider must make disclosures sufficient to permit the fiduciary to make an informed decision regarding the proposed float . . ." DOL FAB 2002-03. Mr. Witz claims that the DOL's recommendations in its FAB were not satisfied because State Street did not adequately disclose information about the float such that Plan fiduciaries could make an informed decision on the float arrangement as part of State Street's compensation (*id.*; PAF ¶ 63).

Defendants' expert Donald Myers disagrees. He concludes that State Street properly disclosed that it retained the benefit of any float on disbursements by check in fee schedules or

invoices from 2001 through 2006 and in a meeting with Plan fiduciaries in 2007. (Defs.' Ex. 30, Myers Dep., Ex. A, Myers Report ("Defs.' Ex. 30-A") at 5-7). The discussion at the September 2007 meeting indicates that State Street was providing annual reports of the float amounts on disbursement checks, enabling Kraft to evaluate the float as part of State Street's total compensation (Defs.' Ex. 30-A at 8-9). In addition, the float was disclosed when Plan fiduciaries conducted negotiations with State Street's predecessor, Bankers Trust, in 2002, and State Street adhered to the same fee schedule as Bankers Trust (Defs.' Ex. 30-A at 8).

Furthermore, Mr. Myers stated that in his experience as an attorney who specializes in the fiduciary responsibility provisions of ERISA, float is generally treated as part of a bank's compensation; the bank's fees would be higher in the absence of float (DSOF ¶ 129; Defs.' Ex. 30-A at 2-3). In addition, Mark Werner testified that in his experience the trustee's compensation will "come out to about the same" regardless of whether the Plan or the trustee retains the float (DSOF ¶ 118).

The disclosure that State Street retained float in the fee schedules, as well as the evidence of at least one meeting discussing this issue, demonstrates that defendants properly allowed and adequately monitored the float. Moreover, plaintiffs offer no evidence that State Street's retention

41

of float led to excessive fees or losses to participants in the Plan.[12] Thus, defendants did not breach

their fiduciary duty by allowing State Street to receive part of its compensation as float.[13]

## CONCLUSION

For the foregoing reasons, we grant defendants' motion for summary judgment (doc. # 222).

The case is terminated.

**ENTER:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**Dated: January 27, 2010**

---

[12]Plaintiffs do not argue that defendants breached their fiduciary duty by failing to disclose the float to Plan participants. That argument would fail under *Associates in Adolescent Psychiatry, S.C. v. Home Life Insurance Company*, 941 F.2d 561, 569 (7th Cir. 1991). In that case, the Seventh Circuit held that a trustee is entitled to compensation for its services in the form of float, which the Court there defined as "short-term interest-free use of funds." The Court held that even though investors' rates of return may have been marginally higher without allowing the trustee to retain the float, the company did not breach its fiduciary duty by failing to alert investors to the float because it was merely one of the total costs of administering the annuity – such as copying and equipment costs – that reduced the net returns payable to investors. *Id.* The company had no duty to calculate and disclose separately each expense of the fund. *Id.* Similarly, in *Hecker* the Seventh Circuit held that the fiduciaries provided adequate disclosure by disclosing to participants the total fees for the funds, rather than the later internal, post-collection distribution of the fee. *Hecker*, 556 F.3d at 586.

[13]In light of our ruling, we need not reach defendants' additional arguments regarding ERISA's safe harbor and statute of limitations provision. In addition, defendants note that the complaint arguably encompasses a claim based on a violation of the duty of loyalty, although plaintiffs did not specifically plead such a claim, and they ask the Court to preemptively dismiss any loyalty claims as well (Defs.' Mem. at 4 n.2). There is no need for such "preemptive" dismissal because that claim is not evident on the face of the complaint, is not set forth in the Joint Statement, and is not addressed in the summary judgment briefing.